1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT
                             WESTERN DISTRICT OF WASHINGTON
                                        AT SEATTLE
9

10   MONTY J. BOOTH, et al.,                    CASE NO. C13-1533JLR

11                       Plaintiffs,            ORDER GRANTING IN PART
                                                AND DENYING IN PART
12          v.                                  PLAINTIFFS' MOTION FOR
                                                CLASS CERTIFICATION
13   APPSTACK, INC. et al.,

14                       Defendants.

15                             I.     INTRODUCTION

16          Before the court is Plaintiffs' Monty Booth, Ricardo Mascarenas, and Christopher

17   Gregory's motion for class certification.  (Mot. (Dkt. # 35).)  This case arises out of

18   robocalls allegedly initiated by Defendants Steve Espinosa and John Zdanowski to

19   promote their business, Appstack, Inc. ("Appstack").  Plaintiffs request that the court

20   certify two classes:  (1) a class to address alleged violations of the Telephone Consumer

21   Protection Act ("TCPA"), 47 U.S.C. § 227, and (2) a class to address alleged violations

22   of the Washington Dialing and Announcing Device Act ("WADAD"), RCW 80.36.400,

1    and the Washington Consumer Protection Act ("WCPA"), RCA 19.86 *et seq.* (*See* Mot.

2    at 8.)  Having considered the submissions of the parties, the balance of the record, and the

3    relevant law, and deeming oral argument unnecessary, the court grants in part and denies

4    in part Plaintiffs' motion to certify a class.

5                          **II.    BACKGROUND**

6        Appstack was founded in June 2011, in Temecula, California by Mr. Espinosa and

7    Mr. Zdanowski.  (Moore Dep. (Dkt. # 42-1) at 18:21-19:3.)  Appstack sold an all-

8    inclusive mobile marketing solution to small businesses, which included optimizing the

9    businesses' websites for use with mobile devices and then creating advertising campaigns

10    to drive increased traffic to the websites.  (Moore Dep. at 19:20-20:22; Ricci Dep. (Dkt.

11    # 42-2) at 20:15-21:10).  Mr. Espinosa served as Appstack's chief executive officer, and

12    Mr. Zdanowski served as Appstack's chief financial officer.  (Moore Dep. at 17:19-11;

13    21:10-23:17; 43:17-44:18; Ricci Dep. at 24:17-28:4.)

14        In March, 2013, Appstack contracted with a Utah vendor, inContact, for the use of

15    a predictive dialer with voice recording ability.  (*See* Reiten Decl. (Dkt. # 36) Ex. 8

16    ("Project Plan"); Ex. 11 ("Contract"); Ex. 16 ("Bus. Req. Doc").)  Appstack used the

17    dialer to call potential new customers in order to market and promote Appstack's product.

18    (Reiten Decl. Ex. 10 ("Resp. to RFA") at 5.)  Appstack obtained the telephone numbers

19    to be dialed from another vendor, SalesGenie, which maintains databases of contact

20    information for millions of businesses and consumers.  (*See* Reiten Decl. Ex. 14

21    ("Database Sample"), Ex. 13 ("Greer Dep.") at 15:22-16:03.)  Appstack's sales team was

22    able to select the states and types of businesses it preferred to target from SalesGenie's

ORDER- 2

databases and then load the corresponding telephone numbers into the dialer.  (Reiten Decl. Ex. 12 ("Category List"); Ricci Dep. at 37:20-39:22; Moore Dep. at 54:5-55:15.) The dialer automatically called the input numbers and played the following recorded message:

> Google, yes Google, has approved your business for a new mobile marketing system.  To take advantage of this new exciting program, press one.  To be removed from the list and give the spot to your competitor, press two.

(Bus. Req. Doc. at 817-18.)  The dialer's call records show that Appstack ultimately dialed over 90,000 cellular telephone ("cell phone") numbers nationwide and over 11,000 landline and cell numbers with a Washington State area code, with an average of 6 to 7 calls per telephone number.[1]  (Hansen Decl. (Dkt. # 38) at 3-4.)

Mr. Booth, who owns a small law firm located in Everett, Washington, received 17 robocalls from Appstack on his business landline between May 3, 2013, and June 20, 2013.  (Reitan Decl. Ex. 19 (""), Ex. 17 ("Booth Dep.") at 10:07-23, 20:7-16, 28:1-3.) Mr. Booth had never had any interaction with Appstack prior to receiving the first call. (Booth Dep. at 42:23-43:43.)

Mr. Mascaranas, who is a resident of Gig Harbor, Washington, received 10 robocalls from Appstack to his cell phone between July and September, 2013.  (2d Reiten Decl. (Dkt. # 46) ¶ 4, Ex. 22; Mascarenas Decl. (Dkt. # 39) ¶ 2.)

---

[1] Plaintiffs' expert eliminated from his calculation calls that were terminated within 6 seconds or less because in his opinion such a short duration indicates that "the called party answered and immediately hung up or an answering machine was detected and the dialer immediately hung up on the call." (Hansen Decl. ¶ 12.)

ORDER- 3

1  Mr. Gregory, who is a resident of Kent, Washington, received eleven robocalls from

2  Appstack to his cell phone between June and September, 2013.

3  (2d Reiten Decl. ¶ 5, Ex. 23; Gregory Decl. (Dkt. # 40) ¶¶ 2, 6.)

4       It appears that inContact ceased dialing on behalf of Appstack on October 15,

5  2013.  (Reiten Decl. (Ex. 5) ("Collection Emails") at 463.)  Appstack ceased operations

6  around May, 2014, and is now defunct.  (Ricci Dep. at 24:17-25:20; Moore Dep. at

7  21:10-23:17.)

8       In this action, all three lead plaintiffs seek to certify a Washington class regarding

9  alleged WADAD violations, and Mr. Gregory and Mr. Mascaranas seek to certify a

10  national cellphone class regarding alleged TCPA violations.  (*See generally* 2d Am.

11  Compl. (Dkt. # 49); Mot.)  Plaintiffs also seek to hold Mr. Espinosa and Mr. Zdanowski

12  vicariously liable for the claims against Appstack.  (*See generally* 2d Am. Compl. (Dkt.

13  # 49); Mot.)  Plaintiffs' motion to certify a class is now before the court.

14               **III.   ANALYSIS**

15       After setting forth the applicable standard, the court addresses the certification of

16  each proposed class separately below.

17  **A.   Class Certification Standard**

18       "Class certification is governed by Federal Rule of Civil Procedure 23."  *Wal-*

19  *Mart Stores, Inc. v. Dukes*, ---U.S.---, 131 S. Ct. 2541, 2548 (2011).  Under Federal Rule

20  of Civil Procedure Rule 23(a), the party seeking certification must first demonstrate that

21  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are

22  questions of law or fact common to the class; (3) the claims or defenses of the

1  representative parties are typical of the claims or defenses of the class; and (4) the

2  representative parties will fairly and adequately protect the interests of the class." *Id.*

3  (quoting Fed. R. Civ. P. 23(a)).  "Second, the proposed class must satisfy at least one of

4  the three requirements listed in Rule 23(b)." *Dukes*, 131 S. Ct. at 2548; *see also Leyva v.*

5  *Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).  Here, Plaintiffs seek to certify a

6  class under Rule 23(b)(3), which requires that "questions of law or fact common to class

7  members predominate over any questions affecting only individual members, and that a

8  class action is superior to other available methods for fairly and efficiently adjudicating

9  the controversy."  Fed. R. Civ. P. 23(b)(3); *see also Leyva*, 716 F.3d at 512; (Mot. at 14.)

10      Rule 23 "does not set forth a mere pleading standard." *Dukes*, 131 S.Ct. at 2551.

11  Rather, "certification is proper only if the trial court is satisfied, after a rigorous analysis,

12  that the prerequisites of Rule 23(a) have been satisfied." *Id.* (internal citation omitted).

13  "[I]t may be necessary for the court to probe behind the pleadings before coming to rest

14  on the certification question." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

15  This is because "the class determination generally involves considerations that are

16  enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.*

17  (internal quotation omitted).  Nonetheless, the ultimate decision regarding class

18  certification "involve[s] a significant element of discretion." *Yokoyama v. Midland Nat.*

19  *Life Ins. Co.*, 594 F.3d 1087, 1090 (9th Cir. 2010).

20      In addition to the express requirements of Rule 23, courts also require a putative

21  lead plaintiff to show that the class definition is ascertainable. *See O'Connor v. Boeing*

22  *N. Am., Inc.,* 184 F.R.D. 311, 319 (C.D. Cal. 1998).  Specifically, a class definition must

1  be "precise, objective and presently ascertainable." *Id.* "While the identity of each class

2  member need not be known at the time of certification, the class definition must be

3  definite enough so that it is administratively feasible for the court to ascertain whether an

4  individual is a member." *Id.* "The proposed class definition should describe a set of

5  common characteristics sufficient to allow a prospective plaintiff to identify himself or

6  herself as having a right to recover based on the description." *Kristensen v. Credit*

7  *Payment Servs.*, 12 F. Supp. 3d 1292, 1303 (D. Nev. 2014).  Membership "must be

8  determinable from objective, rather than subjective, criteria." *Id.*  However, "it is not

9  fatal for class definition purposes if a court must inquire into individual records, so long

10 as the inquiry is not so daunting as to make the class definition insufficient." *Agne v.*

11 *Papa John's Int'l, Inc.*, 286 F.R.D. 559, 566 (W.D. Wash. 2012).

12 **B.    TCPA class**

13          As relevant here, the TCPA provides:  "It shall be unlawful for any person within

14 the United States . . . to make any call (other than a call . . . made with the prior express

15 consent of the called party) using any automatic telephone dialing system or an artificial

16 or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone

17 service."  47 U.S.C. § 227(b)(1)(iii); *see also Meyer v. Portfolio Recovery Assocs., LLC*,

18 707 F.3d 1036, 1043 (9th Cir. 2012).  Under the TCPA, a called party may recover "for

19 actual monetary loss . . . [or] receive $500 in damages for each such violation, whichever

20 is greater."  47 U.S.C. § 227(b)(3).

21          Mr. Gregory and Mr. Mascarenas seek to certify a nation-wide class under the

22 TCPA.  (Mot. at 15.)  They propose the following class definition:

All persons or entities in the United States who, on or after four years before the filing of this action, received a call on their cellular telephone line with a pre-recorded message, made by or on behalf of Defendants, and without the recipient's express prior consent.

*Id.*

## 1. Ascertainability

Despite the fact that Plaintiffs' class definition relies only on objective criteria, and describes a set of common characteristics sufficient to allow members to identify themselves based on the description, *see Kristensen,* 12 F. Supp. 3d at 1303, Defendants contend that it is not administratively feasible for the court to determine who is a member of Plaintiffs' TCPA class.  (Resp. (Dkt. # 41) at 19.)  The court disagrees.

An overarching theme in Defendants' arguments is the limitations of the dialer's call records.  (*See generally* Resp. at 9 (explaining that the dialer's call records show only "the telephone numbers dialed . . . , the date and time of the outbound calls, minutes of usage, and time zones").)  In general, Defendants' reliance on these limitations is misplaced because Plaintiffs intend to rely on additional records, such as telephone carrier records and reverse-lookup directories, to identify class members and establish elements of the claims.  (*See generally* Reply (Dkt. # 45); Hansen Decl.; Supp. Hansen Decl. (Dkt. # 47).)  Specifically, Defendants make much of the fact that the dialer's call records do not distinguish between cell phones and landlines.  (Resp. at 20.)  Plaintiffs' expert, however, has already proved it is possible to rely on other sources to distinguish cell phones from landlines.  (*See* Hansen Decl. at 3-4 (identifying the number of cell phones and landlines called by the dialer).)  Defendants also argue that the dialer's

1    records do not show whether a connection was made.  (Resp. at 15-16.)  Plaintiffs'

2    expert, however, has excluded from his calculations all calls that were terminated within

3    6 seconds or less because in his opinion such a short duration indicates that "the called

4    party answered and immediately hung up or an answering machine was detected and the

5    dialer immediately hung up on the call."  (Hansen Decl. ¶ 12.)  Defendants put forth no

6    evidence suggesting that calls longer than 6 seconds were not connected.  Finally,

7    Defendants argue that SalesGenie's current database is not reliable as a reverse lookup

8    directory because SalesGenie is constantly updating, adding, and deleting listings.  (Resp.

9    at 11-12.)  Plaintiffs' expert, however, has already identified names and addresses for

10   8,000 of the 11,000 numbers with Washington area codes, and intends to rely on other

11   databases such as LexisNexis to determine the remaining class members.  As such, the

12   court concludes that Defendants' ascertainability arguments based on the reliability of the

13   dialer's call records are not meritorious.

14        Defendants' next argument is based on the fact that the proposed class definition

15   includes persons who "received a call on their cellular telephone."  (Resp. at 20.)

16   Defendants contend that this description requires identifying the "actual recipient of the

17   call" rather than the number that was dialed by the dialer.  (*Id.*)  Defendants argue that

18   this task is "impossible" because the dialer's call records do not contain information

19   regarding whether a call was automatically forwarded from a cellular phone to a different

20   type of phone, such as a landline or internet-based phone service application.  (*Id.*)

21        The court notes first that the assertion of impossibility appears to be incorrect:

22   Plaintiffs' expert explains that the carrier records associated with a cellular phone number

will provide information regarding the number and location to which a call was forwarded.  (Supp. Hansen Decl. ¶¶ 3-5.)  It "is not fatal for class definition purposes if a court must inquire into individual records, so long as the inquiry is not so daunting as to make the class definition insufficient." *Agne*, 286 F.R.D. at 566.  As such, if the class definition required identification of the phone that received the call, Defendants' ascertainability argument would fail.

More importantly, as Plaintiffs correctly note, according to the plain language of the TCPA, liability does not turn on whether a call was received on a cellular telephone but rather whether a call was made *to* a cellular telephone.  (Reply at 7.)  Specifically, the TCPA provides that it is unlawful for any person to, without prior express consent, make a call using a prerecorded voice "to any telephone number assigned to a . . . cellular telephone service."  47 U.S.C. § 227(b)(1)(iii).  As such, as long as the dialed number was assigned to a cellular telephone service, the fact that the call may have ultimately been forwarded to a landline or some other device is irrelevant to establishing liability.

Unfortunately for Plaintiffs, however, that does not necessarily mean that the fact is irrelevant to the class definition.  Plaintiffs' description of persons who "received a call on their cellular telephone" could be read to limit the class to exclude persons who ultimately received calls to their cell phone number on a different device.  It is clear from Plaintiffs' arguments that they do not intend to so limit their class, but rather believe that their class definition includes all "calls from Defendants that contained a pre-recorded message, to a cell phone, within the last four years." (*See* Reply at 7 (listing the "objective" elements of their class definition).)  Accordingly, to avoid further confusion

1   on the matter, the court exercises its discretion to modify the class definition.  *See*

2   *Armstrong v. Davis*, 275 F.3d 849, 872 (9th Cir. 2001) ("Where appropriate, the district

3   court may redefine the class.").  The court modifies the class definition to apply to

4   persons who "received a call *to* their cellular telephone line."  In light of this

5   modification, Defendants' ascertainability challenge fails.

6        Defendants' third argument is that it is administratively infeasible to determine

7   whether a given phone call was received in the United States.  (Resp. at 20.)  Plaintiffs

8   correctly note that the TCPA does not require recipients to be located in the United States

9   if the calling party is also located inside the United States.  (*See* Resp. at 7 (quoting 47

10  U.S.C. § 227(b)(1)(iii) ("It shall be unlawful for any person within the United States, or

11  any person outside the United States if the recipient is within the United States . . . to

12  make any call . . . .").)  Because Appstack was a California company that retained a Utah

13  vendor to place the call (*see* 2d. Reiten Decl. Ex. 20), liability under the TCPA does not

14  depend on class members' locations.

15       Once again, however, Plaintiffs overlook the fact that their class definition, which

16  only applies to "[a]ll persons or entities in the United States," appears to self-impose this

17  requirement.  (Mot. at 15.)  The court notes that the phrase "in the United States" could

18  be interpreted in two ways:  (1) to describe the person's or entity's location at the time it

19  received the call or (2) to describe the person's or entity's current location.  Because the

20  phrase appears directly after "all persons or entities" but before "call on their cellular

21  telephone line," the court interprets the phrase as modifying the described "persons or

22  entities" rather the "call on their cellular telephone line."  This interpretation has the

additional advantage of meshing with Plaintiffs' arguments and apparent intentions.  (*See* Reply at 7.)  Accordingly, at this time, the court interprets Plaintiffs' class definition to exclude persons or entities currently located outside the United States.  This objective criteria can be established by a reverse look-up of the address associated with each telephone number (*see* Hansen Decl. ¶ 9), which is likely necessary anyway for purposes of providing class notice.  Therefore, the class is ascertainable.[2]

Defendants' final argument is that the class is not ascertainable because each potential member would have to demonstrate that it did not give prior express consent to be called in order to be included in the class.  (Reply at 21.)  The court shares Defendants' concern about the requirement for lack of prior express consent, albeit for a slightly different reason.

As phrased, Plaintiffs' definition is a "fail-safe" class.  A fail-safe class occurs "when the class itself is defined in a way that precludes membership unless the liability of the defendant is established."  *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010).  "Because the TCPA prohibits calls to cellular telephones using [a prerecorded voice] unless prior express consent has been given, defining the class to include anyone who received such a call without prior express consent means that only those potential members who would prevail on this liability issue would be members of the class."  *Onley v. Job.com, Inc.*, No. 1:12-CV-01724-LJO, 2013 WL 5476813, at *11 (E.D. Cal. Sept. 30, 2013) (finding that a class definition that recited all of the elements

---

[2] If it is later established that Plaintiffs' must prove the location of the received call to determine class scope, this information can be established by objective proof as described below in Section III.C.1.

1   of a TCPA claim and the requirement of a lack of prior consent was fail-safe); *see also*

2   *Taylor v. Universal Auto Grp. I, Inc.*, No. 3:13-CV-05245-KLS, 2014 WL 6654270, at

3   *22 (W.D. Wash. Nov. 24, 2014) ("The court . . . is persuaded that inclusion of the

4   'without prior consent' language in the national classes definition makes it a 'failsafe'

5   class, as clearly the issue of consent is central to determining defendant's liability.).

6        Although the Ninth Circuit has not categorically forbid fail-safe classes, it has

7   discussed their dangers.  *In re AutoZone, Inc., Wage & Hour Emp't Practices Litig.*, 289

8   F.R.D. 526, 546 (N.D. Cal. 2012) (quoting *Kamar*, 375 F. App'x at 736).  The problem

9   with a fail-safe class is that, "once it is determined that a person, who is a possible class

10  member, cannot prevail against the defendant, that member drops out of the class."

11  *Kamar*, 375 F. App'x at 736.  Either the class members win or are not in the class, but the

12  court cannot enter an adverse judgment against the class.  *In re AutoZone, Inc.*, 289

13  F.R.D. at 545-46.  That result is not only "palpably unfair to the defendant" but it is "also

14  unmanageable [from the outset]—for example, to whom should the class notice be sent?"

15  *Kamar*, 375 F. App'x at 736.

16       Consequently, district courts have discretion to redefine a class to avoid the

17  problems inherent in fail-safe classes.  *See In re AutoZone, Inc.*, 289 F.R.D. at 545-46;

18  *Heffelfinger v. Elec. Data Sys. Corp.*, No. CV 07-00101 MMM EX, 2008 WL 8128621,

19  at *10 ("Given the difficulties with the proposed [fail-safe] class definition set forth in

20  plaintiffs' motion, the court has discretion either to redefine the class or to afford

21  plaintiffs an opportunity to do so."); *Gray v. Cnty. of Riverside*, No. EDCV 13-00444-

22  VAP, 2014 WL 5304915, at *13 (C.D. Cal. Sept. 2, 2014) (revising a class definition to

avoid a fail-safe class).  Accordingly, in *Onley*, the court removed the requirement for a lack of prior consent from the TCPA in order to avoid ascertainability problems associated with the previous fail-safe definition.  *See Onley v. Job.com, Inc.*, No. 1:12-CV-01724-LJO, 2013 WL 5476813, at *11 (modifying the class definition to read "[a]ll persons within the United States who received any telephone call/s from Defendant . . . to said person's cellular telephone made through the use of any automatic telephone dialing system . . . .").

The court agrees that such an approach is appropriate here.  Omitting the requirement "without the recipient's prior consent" removes the need to identify which persons gave consent in order to determine the scope of the class, as well as the need to effectively determine liability in order to send class notice.  As a result, the class definition is ascertainable.

As modified by the court, the TCPA class definition reads:

> All persons or entities in the United States who, on or after four years before the filing of this action, received a call to their cellular telephone line with a pre-recorded message, made by or on behalf of Defendants.

The court proceeds to analyze the Rule 23 factors with respect to this modified definition. *See Gray v. Cnty. of Riverside*, 2014 WL 5304915, at *13.

## 2. Numerosity

"The prerequisite of numerosity is discharged if 'the class is so large that joinder of all members is impracticable.'" *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998) (quoting Fed. R. Civ. P. 23(a)(1)).  Here, Plaintiffs put forth evidence that the

1   proposed TCPA class likely includes over 90,000 members.[3]  (Hansen Decl. at 4).

2   Defendants do not dispute that the class is sufficiently numerous to satisfy this

3   requirement.  (Resp. at 25 (citing *Celano v. Marriott Int'l, Inc*., 242 F.R.D. 544, 549

4   (N.D. Cal. 2007) ("[C]ourts generally find that the numerosity factor is satisfied if the

5   class comprises 40 or more members.").)  Due to both the number of class members

6   implicated and their geographical dispersion, the court finds that joinder of separate

7   actions would be impracticable.  *See McCluskey v. Trs. of Red Dot Corp. Emp. Stock*

8   *Ownership Plan & Trust*, 268 F.R.D. 670, 674 (W.D. Wash. 2010).  Accordingly, this

9   prong is met.

10      **3.  Commonality**

11      The requirement of "commonality" is met through the existence of a "common

12   contention" that is of "such a nature that it is capable of classwide resolution."  *Dukes*,

13   131 S. Ct. at 2551.  A contention is capable of classwide resolution if "the determination

14   of its truth or falsity will resolve an issue that is central to the validity of each one of the

15   claims in one stroke."  *Id.*  Accordingly, "what matters to class certification . . . is not the

16   raising of common questions—even in droves—but, rather the capacity of a classwide

17   proceeding to generate common answers apt to drive the resolution of the litigation."  *Id.*

18   This requirement is "construed permissively."  *Hanlon*, 150 F.3d at 1019.  Accordingly,

19   "[a]ll questions of fact and law need not be common to satisfy the rule."  *Id.*; *see also*

20   *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010).

21

22      [3] The court's modifications to the class definition do not affect Plaintiffs' class numerosity
calculations because Plaintiffs assumed for their calculations that no member had given consent.

1    Here, class members' TCPA claims are predicated on a common course of

2    conduct by Appstack:  the use of the same predictive dialer to robocall and play the same

3    recorded message to various cell phone numbers.  As such, these claims implicate

4    questions of law and fact that can be resolved in one stroke, including, for example,

5    whether the dialer used by Appstack constitutes an automatic telephone dialing system or

6    an artificial or prerecorded voice as defined by the statute, *see* 47 U.S.C. § 227(b)(1)(iii),

7    whether the dialer's call records indicate calls to members' cell phone numbers, and

8    whether Mr. Espinosa and Mr. Zdanowski should be held vicariously liable for

9    Appstack's calls.  *See Taylor*, WL 6654270, at *11 (finding commonality where class

10   members' TCPA claims were all based on the same prerecorded telephone message);

11   *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 567 (W.D. Wash. 2012) (finding

12   commonality because "all class members were sent substantially similar unsolicited text

13   messages by the same defendants, using the same automatic dialing technology," and

14   because "the question of whether [the defendant] can be held liable for the conduct of its

15   franchisees is a common question whose answer is apt to drive resolution of the case").

16   Accordingly, the commonality prong is satisfied.

17      **4.  Typicality**

18      "[R]epresentative claims are 'typical' if they are reasonably co-extensive with

19   those of absent class members; they need not be substantially identical."  *Hanlon*, 150

20   F.3d at 1020.  "Typicality refers to the nature of the claim or defense of the class

21   representative, and not to the specific facts from which it arose or the relief sought."

22   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Nonetheless, the

1   "commonality and typicality requirements of Rule 23(a) tend to merge."  *Gen. Tel. Co. of*

2   *Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).  "Both serve as guideposts for determining

3   whether under the particular circumstances maintenance of a class action is economical

4   and whether the named plaintiff's claim and the class claims are so interrelated that the

5   interests of the class members will be fairly and adequately protected in their absence."

6   *Id.*  In determining typicality, courts consider "whether other members have the same or

7   similar injury, whether the action is based on conduct which is not unique to the named

8   plaintiffs, and whether other class members have been injured by the same course of

9   conduct."  *Hanon*, 976 F.2d at 508.  The Ninth Circuit has cautioned that "a named

10  plaintiff's motion for class certification should not be granted if there is a danger that

11  absent class members will suffer if their representative is preoccupied with defenses

12  unique to it."  *Id.*

13          Defendants do not challenge the typicality of Mr. Gregory and Mr. Mascarena's

14  TCPA claims.  (*See* Resp. at 23-24.)  As discussed in the preceding section, Plaintiffs put

15  forth evidence showing that Appstack's robocalls are not unique to Mr. Gregory and Mr.

16  Mascarena and that the other class members have received and been injured by the same

17  robocalls.  *See* Section III.B.3; (*see generally* Hansen Decl.; Supp. Hansen Decl.)

18  Moreover, there is no indication that Mr. Gregory and Mr. Mascarena's TCPA claims are

19  subject to unique defenses.  Accordingly, these claims are "reasonably co-extensive" with

20  those of absent class members.  *See Hanlon*, 150 F.3d at 1020.  The typicality prong is

21  met.

22  *//*

ORDER- 16

1

### 5.  Adequacy

2      "To determine whether named plaintiffs will adequately represent a class, courts

3 must resolve two questions: '(1) do the named plaintiffs and their counsel have any

4 conflicts of interest with other class members and (2) will the named plaintiffs and their

5 counsel prosecute the action vigorously on behalf of the class?'" *Ellis v. Costco*

6 *Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (quoting *Hanlon*, 150 F.3d at 1020).

7 Here, Defendants do not challenge Plaintiffs' counsel's qualifications.  (Resp. at 25 n.9).

8 The court agrees that Plaintiffs' counsel satisfies this criterion.  (*See* Terrel Decl. (Dkt.

9 # 37) (describing proposed class counsel's qualifications and history of related

10 litigation).)

11      Defendants challenge the named plaintiffs' adequacy solely on the same grounds

12 on which they challenge typicality and the predominance of common questions of law or

13 fact.  (Resp. at 25.)  The court relies on its reasoning stated above and below addressing

14 Defendants' arguments concerning typicality and predominance.  *See* Sections  III.B.4,

15 III.B.6.  Defendants do not identify any conflict of interest between proposed class

16 representatives and the class members, and the court is aware of none.  Furthermore, Mr.

17 Gregory and Mr. Mascarenas testify that they are aware of and willing to fulfill the duties

18 and responsibilities associated with serving as a class representative.  (Gregory Decl. ¶ 9;

19 Mascarenas Decl. ¶ 9.)  For all of these reasons, the court finds that this prong is met.

20      ### 6.  Predominance of common questions

21      "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are

22 sufficiently cohesive to warrant adjudication by representation."  *Hanlon*, 150 F.3d at

1   1022 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  Although

2   related to the Rule 23(a) commonality requirement, this criterion is "far more

3   demanding."  *Amchem Prods.*, 521 U.S. at 624.  The predominance inquiry measures the

4   relative weight of the common to individualized questions.  *Id.*  "If the main issues in a

5   case require the separate adjudication of each class member's individual claim or

6   defense, a Rule 23(b)(3) action would be inappropriate."  *Zinser v. Accufix Research

7   Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.) *opinion amended on denial of reh'g*, 273 F.3d

8   1266 (9th Cir. 2001).  "Considering whether 'questions of law or fact common to class

9   members predominate' begins . . . with the elements of the underlying cause of action."

10  *Erica P. John Fund, Inc. v. Halliburton Co.*, ---U.S.---, 131 S. Ct. 2179, 2184 (2011).

11        Here, the TCPA elements of whether Defendants (1) made a call to class

12  members' cellular telephone numbers (2) using an automatic telephone dialing system or

13  prerecorded voice can both be satisfied by common proof.  *See* 47 U.S.C. § 227(b)(1)(iii);

14  *see also Meyer*, 707 F.3d at 1043.  Specifically, Plaintiffs' expert has already identified

15  the cellular telephone numbers dialed by or on behalf of Defendants and there is evidence

16  that the same message was played for all calls.  (*See* Hansen Decl. at 3-4; Bus. Req. Doc.

17  at 817-18.)  Furthermore, "corporate actors may be held individually liable for violating

18  the TCPA where they had direct, personal participation in or personally authorized the

19  conduct found to have violated the statute."  *Ott v. Mort. Investors Corp. of Ohio*, No.

20  3:14-CV-00645-ST, 2014 WL 6851964, at *9 (D. Or. Dec. 3, 2014).  Therefore, the issue

21  of whether Mr. Espinosa and Mr. Zdanowski can be held individually liable for these

22  calls can also be resolved once for the entire class.

1    Defendants' main argument against predominance is that individualized inquiries

2    are necessary to ascertain prior express consent.[4]   The Ninth Circuit has held that express

3    consent is '[c]onsent that is clearly and unmistakably stated.'"   *Satterfield v. Simon &*

4    *Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (quoting Black's Law Dictionary 323

5    (8th ed. 2004)).   Relying on a 1992 order by the Federal Communications Commission

6    ("FCC"), district courts have consistently found that "persons who knowingly release

7    their phone numbers have in effect given their invitation or permission to be called at the

8    number which they have given, absent instructions to the contrary."   *In re Rules & Reg's*

9    *Implementing the Tel. Consumer Prot. Act of 1991, 7 F.C.C.R. 8752, 8769 ¶ 31 (1992);*

10   *see, e.g., Van Patten v. Vertical Fitness Grp., LLC*, No. 12CV1614-LAB MDD, 2014 WL

11   2116602, at *4 (S.D. Cal. May 20, 2014); *Taylor*, 2014 WL 2987395, at *4-5; *Baird v.*

12   *Sabre Inc.*, 995 F. Supp. 2d 1100, 1106 (C.D. Cal. 2014); *Leckler v. Cashcall, Inc.*, No. C

13   07-04002 SI, 2008 WL 5000528, at *2 (N.D. Cal. Nov. 21, 2008).

14   Effective October 16, 2013, the FCC revised its regulations interpreting the TCPA

15   to require written prior consent for autodialed or prerecorded telemarketing or advertising

16   telephone calls.[5]   47 C.F.R. § 64.1200(a)(2); *see also In the Matter of Rules and*

17

18   ───────────────

19   [4] Defendants also reprise the arguments they raised with respect to ascertainability, arguing that
     individualized inquiries are required to determine the telephone number that "actually received" the
     dialed call and whether that number was a cell phone.  (Resp. at 29.)  For the reasons stated previously,
20   *see* Section III.B.1, the court does not agree that such inquiries are necessary.  Under the plain language
     of the TCPA, liability for a robocall turns on whether the number dialed was a cell phone, regardless of
     whether the call was later forwarded elsewhere.  47 U.S.C. § 227(b)(1)(iii).  Defendants have not cited
21   any caselaw or raised any factual considerations suggesting otherwise.

22   [5] Telemarketing is defined as "the initiation of a telephone call or message for the purpose of
     encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted

ORDER- 19

1    *Regulations Implementing the Telephone Consumer Protection Act of* 1992, 27 F.C.C.R.

2    1830, 1874 (2012); *Van Patten, LLC*, 2014 WL 2116602, at *4; *Meyer v. Bebe Stores,*

3    *Inc.*, No. 14-CV-00267-YGR, 2015 WL 431148, at *3 (N.D. Cal. Feb. 2, 2015) ("[T]he

4    TCPA required prior express consent for covered text messages sent before October 16,

5    2013. . . . After that date, such consent had to be in writing in the case of advertising or

6    telemarketing messages.").  Although Plaintiffs' class definition covers the period from

7    August, 2009 to the present, it appears from the record that inContact ceased robocalling

8    on behalf of Appstack on October 15, 2013.  (*See* Collection Emails at 463.)  Therefore,

9    the court applies the previous definition of prior express consent in this order.[6]  *See*

10   *Meyer*, 2015 WL 431148, at *3.

11       Where there is evidence that some class members gave prior express consent but

12   others did not, courts have found that the individualized inquiries necessary to ascertain

13

14   to any person." 47 C.F.R. § 64.1200(f)(12).  Advertising is defined as "any material advertising the
     commercial availability or quality of any property, goods, or services." *Id.* at § 64.1200(f)(1).

15       [6] There is disagreement within the Ninth Circuit as to whether express consent is an affirmative
     defense that must be proved by a defendant or an element of the TCPA claim that must be proved by a

16   plaintiff.  *See Glauser v. GroupMe, Inc.*, No. C 11-2584 PJH, 2015 WL 475111, at *3-6 (N.D. Cal. Feb.
     4, 2015) (collecting cases); *compare Meyer*, 707 F.3d at 1043 (listing consent as an element of the claim)

17   *with Grant v. Capital Mgmt. Servs., L.P.*, 449 F. App'x 598, 600 (9th Cir. 2011) ("'[E]xpress consent' is
     not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the
     defendant bears the burden of proof.").  The court notes that the FCC's 2012 order placed the burden of

18   proving written consent on the telemarketer.  *See In the Matter of Rules and Regulations Implementing
     the Telephone Consumer Protection Act of* 1992, 27 F.C.C.R. at 1874.

19       The court, however, declines to decide the issue here because it is irrelevant for class certification
     purposes.  *See Kristensen*, 2014 WL 1256035, at *9.  The plaintiff's burden at the class certification phase

20   is to "advance a viable theory employing generalized proof to establish liability with respect to the class
     involved." *Id.*  If consent is an element, the plaintiff must show that lack of consent can be addressed
     with class-wide proof. *Id.*  If it is an affirmative defense, then the plaintiff must show that it can defeat

21   the defendant's consent argument with class-wide proof. *Id.* The practical effect is the same:  at the class
     certification stage, the plaintiff must prove that consent, or the lack thereof, can be resolved "on evidence

22   and theories applicable to the entire class." *Id.* (quoting *Stern v. DoCircle, Inc.,* No. SACV–12–2005,
     2014 WL 486262 at *8 (C.D. Cal. Jan. 29, 2014)).

ORDER- 20

consent will preclude a finding that common questions predominate.  *See, e.g.*, *Connelly v. Hilton Grand Vacations Co., LLC*, 294 F.R.D. 574, 577-78 (S.D. Cal. 2013) (finding common questions did not predominate because class members had provided their phone numbers to the defendant in a variety of different scenarios, only some of which constituted prior consent); *Gannon v. Network Tel. Servs., Inc.*, No. CV 12-9777-RGK PJWX, 2013 WL 2450199, at *2-3 (C.D. Cal. June 5, 2013) (finding common questions did not predominate because some putative class members had opted out from future contact by defendant but others had consented).  However, the Ninth Circuit has held that, in the absence of any affirmative evidence of consent, consent is a common issue with a common answer.  *Meyer*, *LLC*, 707 F.3d at 1042 (finding commonality because the defendant "did not show a single instance where express consent was given before the call was placed").  Accordingly, courts afford greater weight to a plaintiff's theory that class-wide proof can show lack of consent when that theory is unrebutted by any evidence.  *See Kristensen*, 2014 WL 1256035, at *9 (finding common issues predominated where the defendants presented no evidence of express consent and the source of the dialed telephone numbers "did not appear to have a mechanism to verify consent"); *see also Agne*, 286 F.R.D. at 566 , 570 ("Defendants' speculation that customers may have given their express consent to receive text message advertising is not sufficient to defeat class certification."); *Ott*, 2014 WL 6851964, at *17 ("[U]nless and until [the defendant] comes forward with some evidence that it received prior express consent before it called putative class members, there is no barrier to certification").

1    Here, Plaintiffs show that SalesGenie, the vendor from which Defendants procured

2  telephone numbers, did not have a mechanism to obtain or verify consent to receive

3  robocalls.  (Reiten Decl. Ex. 18 ("Fruehwald Dep.") at 7:12-8:1); *Kristensen*, 2014 WL

4  1256035, at *9.  Additionally, Mr. Booth testifies that he had no prior interaction with

5  Appstack prior to receiving robocalls from them (Booth Dep. at 42:23-43:03), and

6  Plaintiffs set forth evidence of other putative class members who complained to Appstack

7  about unsolicited robocalls (*see* Reiten Decl. Ex. 6 ("Complaint Emails")).  *See Agne,*

8  286 F.R.D. at 566.

9    Defendants, however, put forth no evidence that any class member gave prior

10  express consent to be contacted by Appstack.  (*See generally* Resp.)  Defendants'

11  contention that any class members who pressed "one" in response to the message

12  provided consent is incorrect.  "Purporting to obtain consent during the call, such as

13  requesting that a consumer 'press 1' to receive further information, does not constitute

14  the *prior* consent necessary to deliver the message in the first place, as the request to

15  'press 1' is part of the telemarketing call."  *In Re Rules & Regulations Implementing the*

16  *Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14099 (2003); *see also Charvat*

17  *v. Allstate Corp.*, No. 13 C 7104, 2014 WL 866377, at *1 (N.D. Ill. Mar. 5, 2014).

18    Moreover, Defendants' contention that the sources from which SalesGenie

19  obtained the telephone numbers may have procured class members' consent to receive

20  robocalls does not rise above speculation, which is inadequate to defeat class

21  certification.  *See Agne,* 286 F.R.D. at 568; *Kristensen*, 2014 WL 1256035, at *9 (noting

22  that the defendants did not have "personal knowledge whether . . . the other purported

1  class members consented when they visited one of the 'hundreds' of websites that [the

2  defendants] allege[d] were the original sources of the cell phone numbers").  Defendants'

3  contention is undercut by the fact SalesGenie relied on public sources to gather its data.

4  (*See* Resp. at 28 n.12 (showing that SalesGenie obtained its data lists from, among other

5  things, phone books, SEC filings, other public filings, annual reports, newspaper

6  publications, and county clerks' offices).  More important, Defendants' contention

7  ignores the Ninth Circuit's holding that consent to be contacted by one company does not

8  constitute consent to be contacted by other, unrelated third-party companies.  *See*

9  *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (finding no

10 express consent where the original scope of consent did not extend to unrelated third

11 party contacts); *see also Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 1134 (S.D. Cal.

12 2014).  The mere fact that class members may have at some time consented to be

13 contacted by an unknown third-party does not mean they consented to be contacted by

14 Appstack.

15      Although Defendants are in the best position to come forward with evidence of

16 consent, they have not done so.[7]  On the current record, the court cannot agree that

17 individualized inquiries into members' consent will predominate at trial.  *See Kristensen*,

18 2014 WL 1256035, at *9; *Agne*, 286 F.R.D. at 566, 570.  Rather, the court finds that the

19 class members' claims are "sufficiently cohesive to warrant adjudication by

20 _____

21      [7] To the extent that the putative class members' received telemarketing calls from Appstack after
   October 15, 2013, the court notes that Appstack is even further from establishing prior written consent
   than it is prior express consent:  Appstack has set forth no evidence or argument even attempting to show
22 prior written consent.  *See* 47 C.F.R. § 64.1200(a)(2); Meyer, 2015 WL 431148, at *3.

1   representation." *See Hanlon*, 150 F.3d at 1022. Therefore, the predominance prong is

2   met.

3       **7. Superiority**

4       When evaluating superiority, courts must consider the nonexclusive list of four

5   factors set forth Rule 23(b)(3). *Zinser*, 253 F.3d at 1190. These factors include  the class

6   members' interests in individually controlling the prosecution or defense of separate

7   actions; the extent and nature of any litigation concerning the controversy already begun

8   by or against class members; the desirability or undesirability of concentrating the

9   litigation of the claims in the particular forum; and the likely difficulties in managing a

10  class action. Fed. R. Civ. P. 23(b)(3). "A consideration of these factors requires the

11  court to focus on the efficiency and economy elements of the class action so that cases

12  allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a

13  representative basis." *Zinser*, 253 F.3d at 1190. "In general, where damages suffered by

14  each putative class member are not large, this factor weighs in favor of certifying a class

15  action." *Id.* This is because the "policy at the very core of the class action mechanism is

16  to overcome the problem that small recoveries do not provide the incentive for any

17  individual to bring a solo action prosecuting his or her rights." *Amchem Prods.*, 521 U.S.

18  at 617.

19      Here, the first factor weighs in favor of certification. As courts frequently

20  recognize, the TCPA's $500 statutory damages provision is likely insufficient to

21  compensate the average consumer for the time and effort involved in bringing a small

22  claims action. *See, e.g., Agne*, 286 F.R.D. at 571; *Kavu,* 246 F.R.D. at 650 (holding that

1   claims under the TCPA are sufficiently small such that they are unlikely to be litigated

2   individually); *Bellows v. NCO Fin. Sys., Inc.,* No. 3:07–CV–01413–W–AJB, 2008 WL

3   4155361, at *8 (S. D. Cal. Sept. 5, 2008) (holding in a TCPA action that "[t]he class

4   action procedure is the superior mechanism for dispute resolution in this matter. The

5   alternative mechanism, permitting individual lawsuits for a small statutory penalty, would

6   be costly and duplicative."). "Without the availability of class relief, many class

7   members would certainly be unable to proceed as individuals because of the disparity

8   between their litigation costs and what they hope to recover." *Taylor*, 2014 WL

9   6654270, at *20 (finding that a class action TCPA suit was superior to individual actions)

10  (internal citations omitted).

11       As to the second and third factors, there is no evidence before the court that other

12  lawsuits concerning this controversy are pending or that concentrating the litigation in

13  this particular forum would be undesireable.

14       Finally, at this stage, it appears that the case is manageable as a class action.  As

15  discussed above, the court expects that the elements of the class members' TCPA claims

16  can be resolved by common evidence, and that any recourse to telephone carrier records

17  or reverse-lookup directories required can be presented succinctly by expert testimony.

18  (*See* Section III.B.4, III.B.5; *see generally* Hansen Decl.; Supp. Hansen Decl.)  Of course,

19  if these issues should prove unmanageable, the court "retains the flexibility to address

20  problems with a certified class as they arise, including the ability to decertify." *United*

21  *Steel Workers Int'l Union v. ConocoPhillips Co.,* 593 F.3d 802, 807 (9th Cir. 2010).

22

**8. Certification**

In conclusion, the court finds that all of the prerequisites of Rule 23(a) and (b) are met and that the class definition as modified is ascertainable. *See Dukes*, 131 S. Ct. at 2548. Accordingly, the court grants Plaintiffs' motion in part, certifies the modified class, and appoints Plaintiffs Ricardo Mascarenas, and Christopher Gregory as class representatives.

**9. Class counsel**

"[A] court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class counsel, a court must consider (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). Upon review, the court concludes that counsel at Terrell Mashall Daudy and Willie, PLLC ("TMDW") have diligently investigated the claims in this action to date and intend to continue to devote appropriate time and resources to this litigation. (*See generally* Terrell Decl.) The court also concludes that counsel at TMDW have evinced knowledge of the class certification standards, TCPA claims, and WADAD claims applicable to this case, and that they possess appropriate levels of experience in similar matters. (*See generally id.*; Mot.; Resp.) Accordingly, the court appoints Beth Terrell, Whitney Stark, Mary Reiten, and Dan Gallagher of the law firm Terrell Marshall Daudt & Willie, PLLC, as class counsel.

1  **C.     WADAD**

2         The WADAD provides:  "No person may use an automatic dialing and

3  announcing device for purposes of commercial solicitation."  RCW 80.36.400(2).  An

4  automatic dialing and announcing device is defined as "a device which automatically

5  dials telephone numbers and plays a recorded message once a connection is made."

6  RCW 80.36.400(1)(a).  Commercial solicitation "means the unsolicited initiation of a

7  telephone conversation for the purpose of encouraging a person to purchase property,

8  goods, or services."  RCW 80.36.400(1)(b).  A violation of the WADAD constitutes a per

9  se violation of the WCPA.[8]  RCW 80.36.400(3); *Palmer v. Sprint Nextel Corp.*, 674 F.

10  Supp. 2d 1224, 1228 (W.D. Wash. 2009).  Under the WADAD, "damages to the recipient

11  of commercial solicitations made using an automatic dialing and announcing device are

12  five hundred dollars."  RCW 80.36.400(3).

13         Here, Plaintiffs originally sought to certify a Washington class defined as:

14         All Washington businesses who received one or more telephone calls made
       by Defendants and/or made on Defendants' behalf using an automatic
15       dialing and announcing device, when such a call included a pre-recorded
       message containing a commercial solicitation and was transmitted to a
16       telephone number with a Washington State area code at any time for the
       period that begins four years from the date of this Complaint to trial.

17  (Mot. at 14.)  In their reply brief, Plaintiffs seek to broaden their definition to cover "all

18  Washington residents" instead of "all Washington businesses."  (Reply at 10; *see also*

19  Resp. at 19 (stating that Appstack called consumers in addition to businesses).)

20

21  _____

22     [8] Because Plaintiffs' WCPA claims are predicated entirely on their WADAD claims, the court
    considers only the WADAD claims in determining whether class certification is proper.

### 1. Location of calls

Critical to Plaintiffs' class certification motion is the fact that the WADAD applies only to "commercial solicitation intended to be received by telephone customers within the state." RCW 80.36.400(2). As this court previously held in *Hartman v. United Bank Card, Inc*, 291 F.R.D. 591, 598 (W.D. Wash. 2013), the WADAD does not apply to calls that were both initiated and received outside the state of Washington. Any other interpretation would render the WADAD unconstitutional under the dormant Commerce Clause because the WADAD would then reach commerce conducted wholly outside of Washington. *Id.* (citing *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1230 (9th Cir. 2010); *see Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) ("[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature."). Accordingly, a party located outside of Washington State that receives a call originating from outside Washington State does not have a claim under the WAWAD. *See Hartman*, 291 F.R.D. at 599.

Here, Appstack was a California company that retained a Utah vendor to dial calls on its behalf. (*See* 2d. Reiten Decl. Ex. 20). As such, any calls placed to people or entities located outside Washington are not actionable under the WADAD. *See Hartman*, 291 F.R.D. at 599. Plaintiffs, however, do not limit their class to people who received calls within the state. Rather, Plaintiff seeks to include all calls made to telephone

1    numbers with Washington area codes.[9]  (Mot. at 14.)  Defendants, however, point to

2    technology, such as mobile phones, Voice over Internet Protocol ("VoIP") services, and

3    softphones (software programs that allow for calls to be made over the Internet using a

4    computer), that render phone numbers portable, as well as to technology, such as call

5    forwarding and virtual or foreign-exchange numbers, that allows a call to terminate at a

6    destination other that described by its area code.  (*See* Fisher Decl. (Dkt. # 43) ¶¶ 8-11.)

7    As Plaintiffs concede, due to the proliferation of this technology, the fact that a number

8    with a Washington State area code was dialed does not necessarily mean that the call was

9    received in Washington State.  (Mot. at 14); *see Hartman*, 291 F.R.D. 598 (finding that a

10   telephone number's area code was an insufficient proxy for the reception location and

11   denying class certification on the basis that individualized inquiries were necessary to

12   determine the reception location); *see also Taylor*, 2014 WL 6654270, at *17 (same).[10]

13

14   _____

15   [9] Although Plaintiffs' class definition also nominally requires that the class member be a
     Washington resident, Plaintiffs' calculation of the class scope does not take that requirement into account.
16   (*See* Hansen Decl. at 4 (finding that Appstack dialed 11,000 numbers with a Washington area code, but
     failing to distinguish which numbers corresponded to Washington residents).)

17   [10] Other courts also have come to the unremarkable conclusion that mobile telephone devices or
     services are in fact mobile and no longer tethered to a specific geographic location irrespective of the area
18   code employed. *See, e.g., WWC Holding Co., Inc. v. Sopkin*, 488 F.3d 1262, 1276 (10th Cir. 2007)
     ("VoIP services are provided through the internet but resemble telephone communications and interact
19   with both traditional wireline services and mobile services.  The locations of both the call origination and
     termination are irrelevant to such services.  A subscriber need only be somewhere with broadband internet
20   access."); *Teltech Sys., Inc. v. Barbour*, 866 F. Supp. 2d 571, 575-76 (S.D. Miss. 2011) ("Due to the
     tremendous growth of mobile phone usage and the fact that many cell customers have mobile phone numbers
     that are associated with an area code other the one where they live, to the [FCC's]imposition of mobile
21   number portability (which permits a mobile customer which switches carriers to keep his existing phone
     number), to the introduction of IP-based services, including voice over internet protocol (VoIP) (which
22   enables the delivery of voice communications over the Internet), and to the growth of call forwarding, it is
     impossible . . . to know whether the recipient [of the call] . . . is in Mississippi.").

1    Plaintiffs do not dispute that some of the putative class members cannot bring

2    WADAD claims, but rather reassure the court that, when it comes time to determine

3    liability, Plaintiffs can use telephone carrier records establish which class members

4    actually have claims.  (Mot. at 13-14; Reply at 12-14.)  Specifically, Plaintiffs' expert

5    explains that it is possible to determine the termination of a call to a cellular phone by

6    looking to cell tower location data, to determine the location of a call to a landline by

7    identifying the phone switch at which the call terminated, and to identify the location of

8    forwarded calls based the number to which it was forwarded, all based on information

9    retained by telephone carriers in their billing records.  (Supp. Hansen Decl. ¶¶ 2-5.)

10   Plaintiffs contend that this process is a "straightforward, mechanical review of service

11   provide records," and will not necessitate individualized inquiries into reception location

12   because the information can be summarized and presented via expert testimony.  (Reply

13   at 14.)  Plaintiffs' expert admits, however, that it is not possible to determine the

14   reception location of VoIP phones (and presumably softphones) via telephone records.

15   (Supp. Hansen Decl. ¶ 6.)

16       **2.  Ascertainability**

17       With respect to the requirement of ascertainability, the court takes issue less with

18   Plaintiffs' proposed methodology than with their proposed order of operations.  As it

19   stands, Plaintiffs' class definition is overbroad—it necessarily includes members to

20   which the WADAD does not apply.  But a class definition that encompasses a substantial

21   number of members who have no cause of action is not sufficiently "precise, objective

22   and presently ascertainable" to be certified.  *See O'Connor*, 184 F.R.D. at 319; *Wolph v.*

1   *Acer Am. Corp.*, 272 F.R.D. 477, 483 (N.D. Cal. 2011); *Nat'l Fed'n of the Blind v. Target*

2   *Corp.*, No. C 06-01802 MHP, 2007 WL 1223755, at *3-4 (N.D. Cal. Apr. 25, 2007)

3   (holding that, because "inclusion of individuals [who are] not entitled to relief would

4   defeat class certification and present obvious standing challenges," a court "cannot avoid

5   addressing the issue of overbreadth at [the class certification] stage").  As such, courts

6   consistently decline to certify class definitions that encompass members who are not

7   entitled to bring suit under the applicable substantive law.  *See Wolph*, 272 F.R.D. at 483

8   (declining to certify a proposed class class on the basis that the "proposed class of 'all

9   persons and entities' who purchased [a defendant's] notebook . . . is too broad because it

10  includes consumers who already received their remedy by returning the notebook for a

11  full refund"); *Hovsepian v. Apple, Inc.,* No. 08-5788 JF (PVT), 2009 WL 5069144, at *6

12  (N.D. Cal. Dec. 17, 2009) ("[T]he class is not ascertainable because it includes members

13  who have not experienced any problems with [the product at issue]."); *Rasmussen v.*

14  *Apple Inc.*, No. C-13-4923 EMC, 2014 WL 1047091, at *12 (N.D. Cal. Mar. 14, 2014)

15  ("[T]he definition is overbroad as it includes within the class individuals who have not

16  experienced any issue or defect . . . ."); *Stearns v. Select Comfort Retail Corp.*, 763 F.

17  Supp. 2d 1128, 1152 (N.D. Cal. 2010).

18      Here, Plaintiff  have put forth no evidence addressing to what extent a class of

19  people who received calls at telephone numbers with Washington area codes is

20  coterminous with a class of people that received the calls in Washington State (and

21  therefore can assert a cause of action under the WAWAD).  (*See generally* Mot.; Reply;

22  Hansen Decl.; Supp. Hansen Decl.)  The record currently before the court suggests that

1  the likelihood that a call to a telephone number with a Washington area code was

2  received in Washington is not overwhelming.  (*See generally* Fisher Decl.; Hansen Decl.;

3  Supp. Hansen Decl.)  The court is concerned about certifying a WADAD class that

4  includes a meaningful number of members without claims under the WADAD.

5  Plaintiffs' proposal to certify a class first and identify whether class members actually

6  have WADAD claims later is no solution.  *See Wolph*, 272 F.R.D. at 483 (rejecting the

7  suggestion that an overbroad class definition could be remedied during the process of

8  claims administration).  Because there is no dispute that Plaintiffs' class as defined is

9  overbroad, the court finds that it is not ascertainable.

10         The court notes that some courts have held that class overbreadth should be

11  addressed under the Rule 23 requirements rather than as a component of ascertainabilty.

12  *See, e.g.*, *Rodman v. Safeway, Inc.*, No. 11-CV-03003-JST, 2014 WL 988992, at *16

13  (N.D. Cal. Mar. 10, 2014).  To the extent that is the case, the court finds that a WADAD

14  class definition that includes members who received telephone calls outside of

15  Washington State founders on the requirements of typicality and predominance of

16  common issues.  *See* Fed. R. Civ. P. 23(a), (b).  Specifically, the class plaintiffs'

17  allegedly representative claims are not "reasonably co-extensive" with those of absent

18  class members because an appreciable number of the absent class members are not

19  entitled to bring claims under the WAWAD.  *See Hanlon*, 150 F.3d at 1020.  Similarly,

20  the class members' claims are not "sufficiently cohesive to warrant adjudication by

21  representation":  As it stands, the overbreadth of the class precludes the court from

22

1    issuing class-wide relief.  *Hanlon*, 150 F.3d at 1022.  For these reasons also, Plaintiffs'

2    class as defined cannot be certified.

3          "Where the court determines that the class definition is overbroad, the court has

4    the discretion to narrow the class to bring it within the requirements of Rule 23."  *Nat'l*

5    *Fed'n of the Blind v. Target Corp.*, 2007 WL 1223755, at *3-4 (modifying definition of

6    overbroad class); *Wolph*, 272 F.R.D. at 483 (same).  Accordingly, the court has

7    considered whether the class definition's overbreadth could be cured in a variety of ways,

8    including, for example, by changing the requirement of "received one or more telephone

9    calls" to "received one or more telephone calls in the State of Washington," or by

10   excluding calls to the types of phones—specifically, cellular telephones, soft phones and

11   VoIP phones—for which Plaintiffs concede "the area code alone may not indicate

12   whether the call was physically received in Washington."  (Mot. at 14.)  The court,

13   however, ultimately declines to attempt to modify the definition.  First, such a substantive

14   redesign of the class definition merits input from the parties on both sides of the issue.

15   Additionally, it appears that the absence of a reception location requirement may be the

16   only thing preventing Plaintiffs' definition from describing a fail-safe class.  Specifically,

17   the definition is worded in terms of the statutory elements of a WAWAD claim such that

18   it "precludes membership unless the liability of the defendant is established."  *Kamar*,

19   375 F. App'x at 736; *see* Mot. at 14; RCW 80.36.400.  For example, Plaintiffs cannot

20   send out class notice until it has been adjudicated whether Defendants' dialer meets the

21   statutory definition of an "automatic dialing and announcing device" and whether

22

1  Defendants' pre-recorded message meets the statutory definition of a "commercial

2  solicitation."  Accordingly, the court will not tamper further with the definition.

3      The court recognizes that "[d]efining a class so as to avoid, on one hand, being

4  over-inclusive and, on the other hand, the fail-safe problem is more of an art than a

5  science."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012).

6  Therefore, the court grants Plaintiffs' leave to move to certify a modified class definition

7  that addresses the deficiencies identified in this order.  No further class discovery is

8  permitted.  Plaintiffs must file their second motion to certify within 30 days of the date of

9  this order.  If Plaintiffs choose not to file a timely second motion to certify a WADAD

10  class, the case will proceed with the TCPA class alone.

11                    **IV.    CONCLUSION**

12      For the foregoing reasons, the court GRANTS in part and DENIES in part

13  Plaintiffs' motion to certify a class (Dkt. # 35).  The court further orders as follows:

14      (1)  The court GRANTS Plaintiffs' motion for certification of a national class to

15  bring claims under the TCPA as modified by the court herein;

16      (2)  The court APPOINTS Beth Terrell, Whitney Stark, Mary Reiten, and Dan

17  Gallagher of the law firm Terrell Marshall Daudt & Willie, PLLC, as class counsel, and

18  APPOINTS Plaintiffs Ricardo Mascarenas, and Christopher Gregory as class

19  representatives;

20      (2)  The court DENIES Plaintiffs' motion for certification of a Washington class

21  to bring claims under the WADAD;

22

ORDER- 34

1          (4)  The court GRANTS Plaintiffs' leave to bring a second motion for class

2    certification of a Washington class with WADAD claims within 30 days of the date of

3    this order.  If Plaintiffs' do not bring a second motion within 30 days, the case will

4    proceed with the TCPA class alone, and the court will issue further scheduling orders as

5    appropriate.

6          Dated this 29th day of March, 2015.

7

8

9    _____
     JAMES L. ROBART
10   United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 35