UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MONTY J. BOOTH, ATTORNEY AT
LAW, P.S., et al.,

                Plaintiffs,

        v.

APPSTACK, INC., et al.,

                Defendants.

CASE NO. C13-1533JLR

ORDER

## I.   INTRODUCTION

This matter comes before the court on Defendants Appstack, Inc., Steve Espinosa, and John Zdanowski's (collectively, "Defendants") motion to decertify both classes that the court has certified (Decert. Mot. (Dkt. # 101); *see also* 1st CC Order (Dkt. # 52); 2d CC Order (Dkt. # 61)); Mr. Espinosa and Mr. Zdanowski's (collectively, "Individual Defendants") motion for partial summary judgment (Dft. MPSJ (Dkt. # 69)); and Plaintiffs Monty J. Booth, Attorney at Law, P.S. ("Booth Law"), Ricardo T. Mascarenas,

ORDER- 1

1 | and Christopher Gregory's (collectively, "Plaintiffs") motion for summary judgment (Plf.

2 | MSJ (Dkt. # 77)). Plaintiffs seek summary judgment on their individual claims as well as

3 | on behalf of the two classes that the court has certified. (*See* Plf. MSJ; 1st CC Order; 2d

4 | CC Order.)

5 | The parties have also moved to strike some of the evidence submitted in

6 | connection with the present motions. (*See* Plf. Resp. (Dkt. # 75) at 9-16; Dft. Resp. (Dkt.

7 | # 85) at 12-13; Plf. Reply (Dkt. # 94) at 2-3; Decert. Reply (Dkt. # 109) at 11-12.)

8 | Finally, the parties have filed a stipulated motion to seal certain documents submitted in

9 | support of Individual Defendants' motion for partial summary judgment. (*See* Stip. MTS

10 | (Dkt. # 97).)

11 | Having considered the submissions of the parties, the appropriate portions of the

12 | record, and the relevant law, and having heard oral argument[1] on May 3, 2016, the court

13 | GRANTS in part and DENIES in part the various motions as detailed herein.

14 | ## II.   BACKGROUND

15 | This case arises out of robocalls allegedly initiated by Appstack and its

16 | cofounders, Mr. Espinosa and Mr. Zdanowski. (*See* 2AC (Dkt. # 49).) Plaintiffs

17 | represent two classes and seek equitable and monetary relief for Appstack and Individual

18 | Defendants' alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47

19 | U.S.C. § 227, the Washington Dialing and Announcing Device Act ("WADAD"), RCW

20 | _____

21 | [1] Oral argument occurred before the motion to decertify both classes became ripe. (*See*
Dkt.) However, due to the overlap in issues between the motions for summary judgment and the

22 | motion to decertify, the court concludes that further oral argument is not necessary. *See* Local
Rules W.D. Wash. LCR 7(b)(4).

1  80.36.400, and the Washington Consumer Protection Act ("CPA"), RCW 19.86 *et seq.*

2  (*See id.* at 10-14.)

3  **A.      The Formation of Appstack**

4         Individual Defendants cofounded Appstack in June 2011.  (1/29/16 Espinosa Decl.

5  (Dkt. # 72) ¶ 6; 2/22/16 Murray Decl. (Dkt. # 76) ¶ 1, Ex. 2 ("Ricci Dep.")[2] at 21:6-10.)

6  Mr. Espinosa conceived of founding Appstack while working for a different internet

7  ~~marketing company, at which he met Mr. Zdanowski.  (1/29/16 Gruber Decl. (Dkt. # 70)~~

8  ¶ 2, Ex. 1 ("Espinosa Dep.") at 14:16-19, 15:8-19.)  Appstack optimized its customers'

9  websites for access from mobile devices and performed search engine optimization

10  services, which are advertising campaigns intended to drive more traffic and business to

11  customers' websites.  (1/29/16 Espinosa Decl. ¶ 7; 1/29/16 Gruber Decl. ¶ 4, Ex. 3

12  ("Moore Dep.") at 19:20-21:9.)

13         In addition to cofounding Appstack, Mr. Espinosa served as Appstack's Chief

14  Executive Officer ("CEO").  (Espinosa Dep. at 18:13-14.)  Mr. Zdanowski served as the

15  Chief Operating Officer ("COO") and then the Chief Financial Officer ("CFO").

16  (Zdanowski Decl. (Dkt. # 71) ¶ 8; Espinosa Dep. at 18:15-19:1.)  In those roles, Mr.

17  Zdanowski helped register the company, draft the articles of incorporation, assemble

18  investor decks, reach out to initial investors, and prepare a financial model.  (1/29/16

19  _____

20         [2] The parties have placed excerpts from several depositions in the record.  (*See, e.g.*, Dkt.
    ## 76-1 to 76-5.)  Several of these excerpts appear in part in multiple places in the record.  (*See,*
21  *e.g.*, Ricci Dep. (Dkt. ## 70-4, 76-1, 78-4).)  When first referencing the transcript of a particular
    deposition, the court indicates the docket number and the deponent.  However, in subsequent
22  citations to that deposition transcript, the court does not indicate which of the multiple locations
    on the docket contains that particular segment of the relevant deposition.

ORDER- 3

1   Espinosa Decl. ¶ 6; 2/22/16 Murray Decl. ¶ 5, Ex. 4 ("Zdanowski Dep.") at 20:21-21:17.)

2   Mr. Zdanowski served in this "CFO-type" role concurrently for multiple companies,

3   including Appstack.  His "level of involvement fluctuated depending on [Appstack]'s

4   needs at various times," which was typical of his role at other companies.  (Zdanowski

5   Decl. ¶ 9.)

6        Several non-party Appstack employees are also important to this lawsuit.  Peter

7   Ricci was Appstack's COO, which put him in charge of sales operations.  (1/29/16

8   Espinosa Decl. ¶ 19; Zdanowski Decl. ¶ 13.)  Nathan Moore began as Appstack's

9   Accounting Manager (Moore Dep. at 16:21-23) and soon thereafter transitioned into a

10  role as Operations Manager (*id.* at 17:15-24).  Finally, Todd Johnson served as Director

11  of Sales until Appstack hired Scott Kirkpatrick to replace Mr. Johnson, at which point

12  Mr. Johnson transitioned to Chief Business Officer.  (Johnson Decl. (Dkt. # 73) ¶ 10;

13  Kirkpatrick Decl. (Dkt. # 89) ¶ 2.)

14  **B.**    **Appstack's Use of an Autodialer**

15       In March 2013, Appstack contracted with inContact to use an autodialer as part of

16  its telephone marketing efforts.  (*See* 2/25/16 Murray Decl. (Dkt. # 78) ¶ 2, Ex. 1 at 1, 4.)

17  Mr. Ricci sought out an autodialer at the recommendation of Mr. Kirkpatrick and Mr.

18  Johnson.  (Ricci Dep. at 39:10-22; Kirkpatrick Decl. ¶ 4.)  Mr. Kirkpatrick negotiated

19  Appstack's contract with inContact.  (Kirkpatrick Decl. ¶ 4.)  inContact agreed to provide

20  the software system, autodialer, and "customer relationship manager," which is a tool

21  "that companies use to manage and analyze customer interactions and data throughout the

22  customer lifecycle." (*Id.* ¶ 6.)  Defendants admit that the "automatic dialing and

1   announcing device" that they received from inContact was used "to promote

2   [Appstack's] products and/or services." (2/25/16 Murray Decl. ¶ 4, Ex. 3 at 24; *see also*

3   2/22/16 Murray Decl. ¶ 7, Ex. 6 (admitting that the calls "were made for marketing

4   purposes and to promote Appstack's products").)

5       To operate the autodialer, Appstack uploaded tens of thousands of phone numbers

6   into the system, and the autodialer called those numbers. (Ricci Dep. at 66:22-67:3.)

7   Appstack contracted with SalesGenie to obtain a lead list of phone numbers. (*Id.* at

8   54:18-55:15; Kirkpatrick Decl. ¶ 6.) Appstack used Mr. Zdanowski's personal credit

9   card to pay SalesGenie for the lead list and other business expenses, but Mr. Zdanowski

10  was apparently unaware of the contract with SalesGenie. (Zdanowski Dep. at 48:19-21,

11  49:17-50:15; Zdanowski Decl. ¶ 16.) Indeed, several Appstack employees had different

12  versions of Mr. Zdanowski's "personal credit card for Appstack under American

13  Express's small business program," and they used those cards for the different types of

14  expenses Appstack incurred. (Zdanowski Decl. ¶ 16; *see also* Moore Dep. at 46:5-13.)

15  Although these credit cards were in Mr. Zdanowski's name, he typically deferred to Mr.

16  Moore in approving bills or expenses for payment. (Zdanowski Decl. ¶ 16.) In addition

17  to using the lead list from SalesGenie, Appstack also engaged in email and search engine

18  marketing and had a referral program. (Kirkpatrick Decl. ¶ 5.) The autodialer also called

19  numbers obtained in those marketing campaigns and other phone numbers voluntarily

20  provided to Appstack by prior customers, which Appstack dialed as part of its "win-back

21  campaign." (*Id.*; *see also* 11/14/14 Reiten Decl. (Dkt. # 36) ¶ 8, Ex. 7 at 1-9; *id.* ¶ 16, Ex.

22  15 at 10.)

ORDER- 5

When a recipient picked up the phone, the autodialer played the following message:

> Google, yes Google has approved your business for a new mobile marketing system. To take advantage of this new exciting program press one. To be removed from the list and give the spot to your competitor, press two.

(2/22/16 Murray Decl. ¶ 15, Ex. 14 at 11.) When the recipient pressed two, the autodialer theoretically added that recipient to the do-not-call list.[3] (*Id.*) When the recipient pressed one, the autodialer connected the recipient to one of approximately 20 live sales representatives who provided information regarding Appstack's services. (*Id.*; *see also id.* ¶ 16, Ex. 15 ("Booth Dep.") at 48:12-49:1; Ricci Dep. at 79:24-80:4; Johnson Decl. ¶ 9.)

Appstack maintained records detailing each call made using the autodialer. (*See, e.g.*, 12/19/14 Reiten Decl. (Dkt. # 46) ¶ 4, Ex. 22.) Plaintiffs' expert, Jeffrey Hansen, analyzed this data and concluded that Appstack placed 601,207 robocalls to 90,163 unique cellular numbers.[4] (Hansen Decl. (Dkt. # 38) ¶ 12; *see also id.* ¶ 4, Ex. 2

---

[3] It is unclear when Appstack operationalized a do-not-call list and to what degree it functioned. (*See* 2/22/16 Murray Decl. ¶ 15, Ex. 14 at 11; 11/14/14 Reiten Decl. ¶ 16, Ex. 15 at 10 (referencing "last week['s] . . . failure of the [do-not-call] list" on June 7, 2013); *id.* ¶ 7, Ex. 6 at 1-2 ("[D]espite my request last week that you take my number . . . off the call list, I continue to receive calls."); Zdanowski Dep. at 49:7-16, 68:2-15; Kirkpatrick Decl. ¶¶ 8 ("The services provided by inContatct [sic] included a scrubbing feature by which parties could manually opt-out of further calls by pressing a button on their phone. This would essentially add the recipient to the [do-not-call list]."), 9-11 (indicating that Mr. Kirkpatrick instructed the sales team to manually opt out recipients that requested not to receive further calls and to update the do-not-call list daily).)

[4] Mr. Hansen eliminated from his calculation calls that were terminated within 6 seconds or less because in his opinion such a short duration indicates that "the called party answered and

ORDER- 6

("Hansen Report").)  He initially concluded that Appstack placed 53,665 robocalls to

8,861 unique Washington landlines; however, some of these numbers corresponded with

VoIP or cell phones.[5]  (Id.)  Using an online database, Plaintiffs cross-referenced these

numbers and concluded that of the 8,861 unique lines, only 5,784 were indeed landlines

rather than VoIP or cell phones.[6]  (4/29/15 Reiten Decl. (Dkt. # 54) ¶ 2-3, Exs. 1-2.)  Of

those 5,784 Washington landlines, reverse lookups confirmed that 5,663 were associated

with Washington addresses.  (See 2/25/16 Murray Decl. ¶ 6.)  Appstack placed 35,205

total robocalls to these 5,663 Washington landlines.  (Id. ¶ 7.)

Various individuals raised concerns and complaints about Appstack's use of the

autodialer.  Mr. Ricci expressed his reservations regarding state and federal law to his

supervisors, who indicated that they would proceed to use the autodialer so long as

Appstack continued making sales.  (Ricci Dep. at 39:23-42:5.)  Furthermore, "just about

every investor that [Appstack] ever talked to" questioned using the autodialer.

(Zdanowski Dep. at 71:17-4.)  Appstack's employees also protested the autodialing

system, and that complaint was sent up the chain of command to Individual Defendants.

(2/22/16 Murray Decl. ¶ 19, Ex. 18 at 1.)  Finally, prospective customers likewise

---

immediately hung up or an answering machine was detected and the dialer immediately hung up on the call." (Hansen Decl. ¶ 12.)

[5] VoIP, which is shorthand for "voice over IP," is a voice application that provides a "virtual presence" in a certain location while allowing for the customer to be physically located "in any location around the United States." (Fischer Decl. (Dkt. # 43) ¶ 16.)

[6] Defendants move to strike the evidence supporting this conclusion for lack of foundation. (Dft. Resp. at 12-13.) The court describes Plaintiffs' methodology only as background information.

ORDER- 7

1  complained about the autodialing as well as the ineffectiveness of the do-not-call list.

2  (*Id.* ¶ 18, Ex. 17 at 2.)  Appstack's employees passed at least some of those complaints on

3  to Individual Defendants.  (*Id.* at 3; *id.* Ex. 18 at 3; Zdanowski Dep. at 68:7-15.)

4        Despite Individual Defendants' awareness of concerns about autodialing,

5  Appstack had limited policies and procedures in place.  (Ricci Dep. at 35:3-19.)  Indeed,

6  Appstack had no policies that related to "telemarketing" or "the crews of autodialers."

7  (*Id.* at 35:14-19; *see also* Espinosa Dep. at 57:16-58:21; Moore Dep. at 70:10-71:9; *but*

8  *see* Kirkpatrick Decl. ¶ 13 ("From time to time, I would review the [do-not-call list]

9  policy and procedure with the sales team at [the sales team's daily] meetings.").)

10  Appstack did not prioritize such policies or procedures because it was a startup company.

11  (Zdanowski Dep. at 46:15-47:6.)  Appstack apparently never investigated whether its

12  sales practices complied with state or federal telemarketing laws.  (Ricci Dep. at

13  94:7-10.)  However, Individual Defendants attest that they deferred on these matters to

14  their employees and believed that at least some controls, such as a do-not-call list, were

15  in place.  (Espinosa Dep. at 56:18-58:21; Zdanowski Dep. at 48:4-50:21.)

16        Appstack began "running out of money" and eventually "reduced [its] team" and

17  then "shut down completely."  (Ricci Dep. at 24:5-24.)  Appstack laid off its sales team

18  on September 24, 2013 (11/14/14 Reiten Decl. ¶ 6, Ex. 5 at 8), and disconnected its

19  account with inContact on October 7, 2013 (*id.* at 5).  Shortly thereafter, Appstack ceased

20  operations.

21  //

22  //

ORDER- 8

**C.    Named Plaintiffs**

Booth Law, a small law firm located in Everett, Washington, and owned by Monty Booth, received 17 robocalls from Appstack on its business landline between May 3, 2013, and June 20, 2013.  (11/14/14 Reiten Decl. ¶ 20, Ex. 19 at 7; Booth Dep. at 10:07-23, 20:7-16, 28:1-3.)  Mr. Booth had never had any interaction with Appstack prior to receiving the first call.  (Booth Dep. at 42:23-43:43.)  Mr. Mascaranas, who is a resident of Gig Harbor, Washington, received 10 robocalls from Appstack to his cell phone between July and September 2013.  (12/19/14 Reiten Decl. Ex. 22; Mascarenas Decl. (Dkt. # 39) ¶ 2.)  Mr. Gregory, who is a resident of Kent, Washington, received 11 robocalls from Appstack to his cell phone between June and September 2013.  (12/19/14 Reiten Decl. ¶ 5, Ex. 23; Gregory Decl. (Dkt. # 40) ¶¶ 2, 6.)

**D.    Procedural History**

Booth Law filed this case on August 27, 2013 (Compl. (Dkt. # 1)), and filed the operative second amended complaint, which adds as plaintiffs Mr. Mascarenas and Mr. Gregory, on December 29, 2014 (2AC).  The court has subsequently certified two classes.  Booth Law represents the WADAD Class, which is defined as "All persons who received on a landline located within the State of Washington one or more pre-recorded telephone messages placed by Defendants or on Defendants['] behalf on or after August 27, 2009, through the date of final disposition of this action."  (2d CC Order at 5, 21.)  Mr. Mascarenas and Mr. Gregory represent the TCPA Class, which is defined as "All persons or entities in the United States who, on or after four years before the filing of this action, received a call to their cellular telephone line with a pre-recorded message, made

1    by or on behalf of Defendants." (1st CC Order at 13, 34.)  Notice has been sent to both

2    classes, and three individuals have opted out.[7]  (2/1/16 Murray Decl. (Dkt. # 74) ¶¶ 2,

3    6-10, Exs. 1-4.)

4          On January 29, 2016, Individual Defendants moved for summary judgment as to

5    their liability.  (Dft. MPSJ.)  Plaintiffs moved for summary judgment on all claims for

6    both classes on February 25, 2016.  (Plf. MSJ.)  On April 22, 2016, approximately a

7    month-and-a-half before trial, Defendants indicated a desire to move to decertify both

8    classes.  (*See* 4/22/16 Dft. Mot. (Dkt. # 98).)  Pursuant to the court's order, the parties

9    briefed that motion on an expedited schedule, and the motion to decertify became ripe on

10   May 13, 2016.  (4/22/16 Order (Dkt. # 100); Decert. Mot.; Decert. Resp. (Dkt. # 105);

11   Decert. Reply.)  In their response to Defendants' motion to decertify both classes,

12   Plaintiffs indicated a desire to further amend the WADAD Class definition.  (Decert.

13   Resp. at 23.)

14         Defendants' motion to decertify the classes and the parties' motions for summary

15   judgment are now before the court.

16   //

17   //

18   //

19   ───────────────────

20         [7] The notice provider used "data files containing 103,744 records" from Plaintiffs.
     (2/1/16 Murray Decl. ¶ 2, Ex. 1 at 2.)  After removing "invalid and duplicate records," the notice
21   provider mailed notice to 82,888 class members.  (*Id.*)  Of those mailings, 10,104 were initially
     returned as undeliverable, and 3,705 remain undeliverable after the notice provider researched
22   and obtained new addresses for the remainder of the 10,104 class members that initially did not
     receive the notice.  (*Id.*)

ORDER- 10

1                       **III.   ANALYSIS**

2 **A.      Standing Following *Spokeo, Inc. v. Robins***

3       The court has an obligation to raise issues concerning its subject matter

4 jurisdiction, including Article III standing, *sua sponte. Bernhardt v. Cty. of L.A.*, 279

5 F.3d 862, 871 (9th Cir. 2002). "To establish Article III standing, an injury must be

6 'concrete, particularized, and actual or imminent; fairly traceable to the challenged

7 action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*,

8 --- U.S. ---, 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson Seed*

9 *Farms*, 561 U.S. 139, 149 (2010)).

10       In *Spokeo, Inc. v. Robins*, No. 13-1339, --- U.S. ---, --- S. Ct. ---, 2016 WL

11 2842447, at *1-16 (May 16, 2016), the Supreme Court addressed Article III standing's

12 "concrete injury" requirement as applied to a plaintiff seeking statutory damages.  In light

13 of the factual similarity between *Spokeo* and this case and the court's ongoing obligation

14 to assess its own subject matter jurisdiction, the court first addresses the impact of

15 *Spokeo. Spokeo* makes clear that "Article III standing requires a concrete injury even in

16 the context of a statutory violation." *Spokeo*, 2016 WL 2842447, at *7.  Although

17 Congress' judgment is "instructive and important, . . . Congress' role in identifying and

18 elevating intangible harms does not mean that a plaintiff automatically satisfies the

19 injury-in-fact requirement whenever a statute grants a person a statutory right and

20 purports to authorize that person to sue to vindicate that right." *Id.*

21       This distinction carries particular weight where the right conferred by statute is

22 procedural rather than substantive. *See id.* at *8.  For instance, in *Spokeo* the defendant

1   allegedly violated the Fair Credit Reporting Act of 1970, 15 U.S.C. § 1681 *et seq.*

2   ("FCRA") by willfully failing to "'follow reasonable procedures to assure maximum

3   possible accuracy of' consumer reports." *Id.* at *3 (quoting 15 U.S.C. § 1681e(b)). The

4   FCRA authorizes actual damages or statutory damages ranging between $100.00 and

5   $1,000.00 per violation. *Id.* (citing 15 U.S.C. § 1681n(a)). Although the Supreme Court

6   expressed no opinion on whether the procedural FCRA violation at issue in *Spokeo*

7   constituted a "concrete injury" sufficient to confer standing on the plaintiff, instead

8   "leav[ing] that issue for the Ninth Circuit to consider on remand," the *Spokeo* Court

9   indicated that some statutory violations could be sufficiently procedural or technical to

10   fail the "concrete injury" requirement. *Id.* at *8 & n.8.

11        Here, the court is satisfied that Plaintiffs' allegations demonstrate "concrete

12   injury" as elucidated in *Spokeo*. In *Spokeo*, the "injury" Plaintiffs incurred was arguably

13   merely procedural and thus non-concrete. *See id.* In contrast, the TCPA and WADAD

14   violations alleged here, if proven, required Plaintiffs to waste time answering or

15   otherwise addressing widespread robocalls. (*See generally* 2AC; Plf. MSJ.) The use of

16   the autodialer, which allegedly enabled Defendants to make massive amounts of calls at

17   low cost and in a short period of time, amplifies the severity of this injury. As Congress

18   and Washington State's legislature agreed, such an injury is sufficiently concrete to

19   confer standing.

20        Besides the "concrete injury" requirement, *Spokeo* does not reexamine any other

21   elements of standing, and the court therefore concludes that *Spokeo* does not impact the

22   court's subject matter jurisdiction over this case.

**B.**      **Legal Standards**

    1. Class Decertification

The court has previously spelled out the standard for class certification and will not do so again here.  (*See* 1st CC Order at 4-6.)  The court has also noted that "[c]lass certification is contingent on the ability to obtain the information necessary to establish class membership."  (2d CC Order at 19.)  "In the event difficulties obtaining the requisite information prove insurmountable, the court 'retain[ed] the flexibility to address problems with a certified class as they arise, including the ability to decertify.'"  (*Id.* at 19-20 (quoting *United Steel Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010)).)

    2. Summary Judgment

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing that there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.  The non-moving party may do this by use of affidavits (or declarations),

1    including his or her own, depositions, and answers to interrogatories or requests for

2    admissions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

3        The court may only consider admissible evidence when ruling on a motion for

4    summary judgment. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002).

5    "Legal memoranda and oral argument are not evidence and do not create issues of fact

6    capable of defeating an otherwise valid summary judgment." *Estrella v. Brandt*, 682

7    F.2d 814, 819-20 (9th Cir. 1982); *see also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d

8    1074, 1078 (9th Cir. 2003) ("Conclusory allegations unsupported by factual data cannot

9    defeat summary judgment.").

10        The court is "required to view the facts and draw reasonable inferences in the light

11   most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

12   Only disputes over the facts that might affect the outcome of the suit under the governing

13   law are "material" and will properly preclude the entry of summary judgment. *Anderson*,

14   477 U.S. at 248. The nonmoving party "must do more than simply show that there is

15   some metaphysical doubt as to the material facts . . . . Where the record taken as a whole

16   could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

17   issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting

18   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As

19   framed by the Supreme Court, the ultimate question on a summary judgment motion is

20   whether the evidence "presents a sufficient disagreement to require submission to a jury

21   or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at

22   251-52.

**C.    Decertification**

       1.  <u>TCPA Class</u>

The thrust of Defendants' motion to decertify is that several contingencies and representations upon which the court relied in certifying the TCPA Class and the WADAD Class have since proven inaccurate, and that individual issues have come to predominate.  (*See generally* Decert. Mot.)  Defendants make four principal arguments in support of decertifying the TCPA Class, which the court addresses in turn.  (*See id.* at 26-28.)

       *a.  Standing and Ascertainability*

First, Defendants argue that individualized proof is necessary to demonstrate "that all putative class members . . . received calls . . . to . . . a number that was theirs at the time of reception."  (*Id.* at 27.)  Plaintiffs respond that "liability and damages can be determined on a class wide basis," and that if those are established, the court can allow individuals and businesses that fit the TCPA Class description to self-identify via affidavit or presentation of phone records from the relevant time period.  (Decert. Resp. at 16-19.)  Defendants protest that because ascertainability goes to standing, Plaintiffs cannot defer it to the claims process, which Defendants argue is effectively the approach Plaintiffs' "common fund" plan takes.  (Decert. Reply at 3-6.)

As a threshold matter, several district courts in the Ninth Circuit have concluded that at least "a person who is the authorized and sole user of a cellular telephone number . . . has standing to pursue a TCPA claim."  *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 565 (W.D. Wash. 2012); *see Olney v. Progressive Cas. Ins. Co.*, 993

1  F. Supp. 2d 1220, 1226 (S.D. Cal. 2014) ("This Court . . . finds that the regular user of a

2  cellular telephone has standing to bring a claim under the TCPA . . . ."); *Gutierrez v.*

3  *Barclays Grp.*, No. 10cv1012 DMS (BGS), 2011 WL 579238, at *5 (S.D. Cal. Feb. 9,

4  2011) ("[T]he Court is persuaded by Plaintiffs' argument that the TCPA is intended to

5  protect the telephone subscriber, and thus it is the subscriber who has standing to sue for

6  violations of the TCPA."); *see also Cellco P'ship v. Wilcrest Health Care Mgmt., Inc.*,

7  No. C09-3534-MLC, 2012 WL 1638056, at *7 (D.N.J. May 8, 2012) (collecting cases in

8  support of the proposition that "[a] burgeoning body of case law establishes that only

9  the . . . 'intended recipient,' has statutory standing to bring suit under the TCPA").  The

10  court agrees that at least the subscriber at the time the call is placed has standing to assert

11  a TCPA claim, and accordingly the appropriate inquiry for standing purposes is who

12  subscribed to the relevant numbers when Appstack placed the calls.  *See* 30 F.C.C.R.

13  7961, 8000-01 (July 10, 2015) ("We find that the 'called party' is the subscriber, *i.e.*, the

14  consumer assigned the telephone number dialed and billed for the call, or the

15  non-subscriber customary user of a telephone number included in a family or business

16  calling plan.").

17         Defendants contend that "Plaintiffs' methodology provides no suggestion of

18  how . . . the actual claimholders . . . can be found, other than through a lengthy and

19  cumbersome 'self-certification,' or by having each and every class member submit

20  telephone records."  (Decert. Reply at 5.)  However, "[i]n this Circuit, it is enough that

21  the class definition describes 'a set of common characteristics sufficient to allow' a

22  prospective plaintiff to 'identify himself or herself as having a right to recover based on

1   the description.'" *McCrary v. Elations Co.*, No. EDCV 13-00242 JGB (OPx), 2014 WL

2   1779243, at *8 (C.D. Cal. Jan. 13, 2014) (quoting *Moreno v. Autozone, Inc.*, 251 F.R.D.

3   417, 421 (S.D. Cal. 2012)).  The *McCrary* court rejected two arguments that Defendants

4   in this case also make.  *Id.* at *7-8.  First, the court rejected the argument that "class

5   members do not have actual proof that they belong in the class" by noting that requiring

6   such proof for every class member would eliminate consumer class actions.  *Id.* at *7

7   (citing *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 535 (N.D. Cal. 2012)).

8   Second, the *McCrary* court rejected the argument that the defendant would "be deprived

9   of its due process right to defend against claims of class membership" because the

10   defendant was free to argue individualized defenses against individual claimants.  *Id.* at

11   *8.

12          Here, the class definition provides an objective basis to identify proper claimants.

13   Furthermore, whether confirmation of TCPA Class members is performed via sworn

14   self-identification, review of specific phone records, or another method, minimal

15   individualized inquiry is required.  In addition, contrary to Defendants' contention (*see*

16   Decert. Reply at 6), Defendants have every opportunity to challenge class membership.

17   For instance, if class members are required to self-identify under oath, Defendants can

18   present evidence from cellular carriers that individuals were not the subscriber to the

19   pertinent phone number during the relevant time period.  If class members are required to

20   present cell records from the relevant time period, Defendants could examine that

21   evidence and discredit it where possible.  Both of these alternatives provide meaningful

22   opportunities to challenge class membership.

ORDER- 17

1    Defendants also provide no evidence that phone number reassignment has actually

2    impacted the TCPA Class.  Although Defendants repeatedly protest that the Federal

3    Communications Commission ("FCC") has indicated that an estimated 100,000 cell

4    phone numbers are reassigned to new users each day, Defendants provide no evidence

5    that even a single member of the TCPA Class that received notice was not the subscriber

6    when Appstack dialed that number.  (*See* Decert. Reply at 1-2, 8, 11 (citing Cohen Decl.

7    (Dkt. # 90) ¶ 4, Ex. 4 ("FCC 15-72 Declaratory Ruling and Order") at 130))[8]; *see also*

8    *Hilao v. Estate of Marcos*, 103 F.3d 767, 786 (9th Cir. 1996) ("If the [defendant] had a

9    legitimate concern in the identities of those receiving damage awards, the district court's

10   procedure could affect this interest.  In fact, however, the [defendant]'s interest is only in

11   the total amount of damages for which it will be liable . . . ."); *Six (6) Mexican Workers v.*

12   *Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990) ("Where the only question is

13   how to distribute damages, the interests affected are not the defendant's but rather those

14   of the silent class members."); *Agne*, 286 F.R.D. at 568 (reasoning that speculation is

15   insufficient to defeat class certification).  The court therefore concludes that not only

16   would Defendants have the opportunity to challenge class membership, but that there is

17   no evidence such challenges would occur on such a wide scale as to render infirm the

18   court's class certification determination.

19   _____

20   [8] In the FCC Declaratory Ruling, FCC Commissioner Michael O'Rielly notes the
frequency of number reassignment to argue that "companies, acting in good faith to contact

21   consumers that have consented to receive calls or texts," should not be "exposed to liability when
it turns out that numbers have been reassigned without their knowledge."  (FCC 15-72

22   Declaratory Ruling and Order at 130; *see also id.* at 124-138.)  There is no evidence or indication
that such a circumstance arose even once in this case.

ORDER- 18

1              *b. Individualized Issues of Consent*

2          Second, Defendants argue that they had consent for some unknown quantity of

3    Appstack's calls. (Decert. Mot. at 27.) Defendants point to evidence that the "win-back"

4    campaign and other marketing occurred, but no part of the record that they reference

5    indicates the size or scope of these marketing efforts. (*See id.*; Kirkpatrick Decl. ¶ 5;

6    11/14/14 Reiten Decl. Ex. 7 at 1-9; *id.* Ex. 15 at 10.) Indeed, at oral argument,

7    ~~Defendants conceded an inability to determine the number of calls to which class~~

8    members consented. In sum, there is no evidence in the record to indicate that consent

9    will require more than a *de minimis* individualized inquiry. The court thus concludes, as

10   it did previously, that Defendants' arguments regarding consent "do[] not rise above

11   speculation, which is inadequate to defeat class certification." (1st CC Order at 22 (citing

12   *Agne*, 286 F.R.D. at 568).)

13             *c. Individualized "Technological Problems"*

14         Third, Defendants reference several "technological problems" that they argue also

15   require individualized inquiries. (Decert. Mot. at 27 (referencing Decert. Mot. at 17-21);

16   Decert. Reply at 8 (same).) However, none of these problems demonstrate that

17   individualized inquiries are necessary. The "records problem," which identifies a minor

18   discrepancy between Mr. Hansen's conclusions and the call records subpoenaed from

19   telephone carriers, pertains only to the WADAD Class. (Decert. Mot. at 17-18; 5/10/16

20   Murray Decl. ¶ 10 ("None of the subpoenaed records relate to any of the TCPA Class

21   members.").) Furthermore, the minimal evidence of discrepancies that Defendants

22   identify—17 calls—is insufficient to demonstrate the unsuitability of the class

1    mechanism.[9] (*See* Decert. Mot.)  The "porting problem" is similarly unpersuasive in the

2    TCPA context because Mr. Hansen devised a method to determine whether the phone

3    number was associated with a mobile device when Appstack autodialed it.  (*See id.* at

4    18-19; Hansen Report at 4-5); *infra* § III.D.1.a.

5            The "telephone number recycling problem" rehashes the argument that Plaintiffs

6    cannot identify who owned which phone lines when Defendants called them.  (*See*

7    Decert. Mot. at 19-20.)  For the reasons articulated above, the court rejects this argument.

8    *See supra* § III.C.1.a.  Finally, the "call-forwarding problem" is not relevant to the TCPA

9    Class.  (Decert. Mot. at 20-21.)  As the court has already indicated,

10           the TCPA provides that it is unlawful for any person to . . . make a call
             using a prerecorded voice "to any telephone number assigned to a . . .
11           cellular telephone service."  As such, as long as the dialed number was
             assigned to a cellular telephone service, the fact that the call may have
12           ultimately been forwarded to a landline or some other device is irrelevant to
             establishing liability.

13   (1st CC Order at 9 (second alteration in original) (quoting 47 U.S.C. § 227(b)(1)(iii)).)

14
     Plaintiffs have a generally applicable methodology to determine whether the dialed
15
     number "was assigned to a cellular telephone service," and thus Defendants' fourth and
16
     final "technological problem[]" also fails to undermine the suitability of the TCPA Class.
17
     (Decert. Mot. at 20-21.)
18

19

20   _____

21           [9] In other briefing, Defendants have identified further shortcomings with the subpoenaed
     telephone company records.  (Dft. Resp. at 8-10.)  However, Defendants fail to demonstrate how
22   any of those problems relate to the TCPA Class.  (*See id.*; Decert. Mot. at 27; *see also* Decert.
     Resp. at 6-7; 5/10/16 Murray Decl. ¶ 10.)

ORDER- 20

1                     *d. "De facto" Fail-Safe Class*

2            Finally, Defendants argue that the TCPA Class will constitute a "de facto

3    'fail-safe'" class if the court concludes that Plaintiffs are entitled to summary judgment

4    on the issue of consent. (Decert. Mot. at 28.)  A fail-safe class is one with a definition

5    that aligns with the elements of the class's claim such that finding no liability for the

6    defendants would necessarily exclude all members from the class.  *See In re AutoZone,*

7    ~~*Inc. Wage & Hour Emp't Practices Litig.*, 289 F.R.D. 526, 545-46 (N.D. Cal. 2012); *see*~~

8    *also Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010).  Fail-safe

9    classes are problematic because they preclude a defendant in a class action from

10   obtaining a binding judgment on the merits against the would-be class members.  *See*

11   *AutoZone*, 289 F.R.D. at 545-46.  In this case, the court removed the phrase "without the

12   recipient's prior consent" from Plaintiffs' proposed TCPA Class definition in order to

13   avoid the fail-safe class problem.  (1st CC Order at 13.)  Defendants therefore argue that

14   the TCPA Class would "return by default to a fail-safe class" if Plaintiffs receive

15   summary judgment as to consent.  (Decert. Mot. at 29.)  Because the court declines to

16   grant summary judgment on the issue of consent, *see infra* § III.D.1.c., the court rejects

17   Defendants' argument as inapplicable.[10]

---

[10] Defendants cite no precedent indicating that a class can become fail-safe because the class is entitled to judgment as a matter of law on certain issues or elements. (*See id.*)  Indeed, such a conclusion would make little sense in light of the rationale against fail-safe classes, which are disfavored because they render the defendant incapable of obtaining a binding favorable judgment. *See AutoZone*, 289 F.R.D. at 545-46. By Defendants' logic, a defendant could concede the elements of a claim that are not captured in the class definition to make the class fail-safe, thereby calling into question the propriety of proceeding under Rule 23. At most,

1    In sum, none of Defendants' arguments justify decertifying the TCPA Class, and

2 the court denies that aspect of Defendants' motion to decertify.

3    2.  The WADAD Class

4    Defendants move to decertify the WADAD Class on many of the same grounds as

5 with the TCPA Class.  (Decert. Mot. at 17-26.)  In response, Plaintiffs concede "that they

6 cannot determine through common proof every WADAD Class member who received

7 robocalls in Washington."  (Decert. Resp. at 2.)  Plaintiffs therefore ask the court to

8 modify the WADAD Class definition to the following: "All persons who received on a

9 landline located within the State of Washington one or more pre-recorded telephone

10 messages placed by Defendants or on Defendants' behalf on or after August 27, 2009,

11 through the date of final disposition of this action and the landline never had call

12 forwarding activated on the account."  (*Id.* at 23.)  This proposed redefinition of the

13 WADAD Class adds the final clause—"and the landline never had call forwarding

14 activated on the account"—to the definition that the court certified previously.  (*See* 2d

15 CC Order at 5.)

16    Plaintiffs' effort to amend the WADAD Class definition stems from Plaintiffs'

17 inability to ascertain where most of Appstack's robocalls terminated.  The dormant

18 Commerce Clause precludes applying the WADAD "to commercial solicitations using

19 automatic dialing and announcing devices that were both initiated and received outside

20 the State of Washington." *Hartman v. United Bank Card, Inc.*, 291 F.R.D. 591, 599

21    _____

22 Defendants have identified tension between the fail-safe class problem and the requirement that a class definition be sufficiently specific.

1   (W.D. Wash. Apr. 8, 2013); (*see also* 1st CC Order ("[T]he WADAD does not apply to

2   calls that were both initiated and received outside the state of Washington.  Any other

3   interpretation would render the WADAD unconstitutional under the dormant Commerce

4   Clause because the WADAD would then reach commerce conducted wholly outside of

5   Washington.").)  Because Defendants are from and operated out-of-state, WADAD

6   liability can be established only by in-state class members.[11]  (*See* 12/19/14 Reiten Decl.

7   ¶ 2, Ex. 20; 2d CC Order at 2); *Hartman*, 291 F.R.D. at 599-600.  Plaintiffs have obtained

8   information on which calls were placed to landlines in Washington, but they have

9   struggled to ascertain which of those calls were forwarded and to where.  (Decert. Resp.

10  at 21-22); *Hartman*, 291 F.R.D. at 599 (citing RCW 80.36.400(2)).  In certifying the

11  WADAD Class, the court rejected Defendants' objections to Plaintiffs' proposed

12  methodology for obtaining this information, but the court also noted that "[c]lass

13  certification is contingent on the ability to obtain the information necessary to establish

14  class membership."  (2d CC Order at 19.)

15       Plaintiffs relied on subpoenas to phone service providers to determine whether call

16  forwarding had been activated on the phone lines that belonged to the WADAD Class.

17  (*See* 5/10/16 Murray Decl. (Dkt. # 106) ¶ 9.)  The responses to those subpoenas varied,

18  but the majority either did not have complete call-forwarding records or indicated call

19  _____

20  [11] The court rejects Plaintiffs' argument that because the dormant Commerce Clause is an
     affirmative defense, Defendants have waived it by failing to raise it in their answer. (*See* Decert.
21  Resp. at 21.)  The issue at hand is the breadth of the WADAD's proscriptions, not whether
     Plaintiffs' claims violate the dormant Commerce Clause. As this court has already ruled,
22  construing the WADAD implicates constitutional concerns such as the dormant Commerce
     Clause. *See Hartman*, 291 F.R.D. at 599.

1   forwarding had been activated on the relevant accounts.  (*See generally* Cohen Decl.

2   ¶¶ 5-31, Exs. 5-31.)  However, Mr. Hansen attests that he can "state with 99% certainty"

3   that of the 5,874 telephone numbers that he contends were associated with landlines, 187

4   of them "received robocalls from Defendants in Washington."  (Decert. Resp. at 2, 21-22;

5   Hansen Decl. (Dkt. # 107) ¶¶ 19, 22.)  Mr. Hansen makes this conclusion based on the

6   subpoenaed records, which despite being incomplete, demonstrate that at least 187

7   telephone numbers never had call forwarding activated.  (Hansen Decl. ¶¶ 19, 22.)

8   Plaintiffs therefore narrowed their WADAD Class definition in a manner that Plaintiffs

9   contend satisfies Rule 23.

10          Plaintiffs' proposed amended WADAD Class definition remains problematic

11   because it would include more than just the 187 members that Mr. Hansen identified.

12   Several carriers responded to the subpoenas by indicating that they categorically lack

13   historic call forwarding data.  (*See, e.g.*, Cohen Decl. ¶ 30, Ex. 30B at 3 ("While [sic] all

14   Comcast voice service subscribers have the ability to forward calls, Comcast does not

15   have historical records of a subscriber activating call forwarding or to what numbers calls

16   were forwarded.").)  Although Mr. Hansen identified 187 members that fall within

17   Plaintiffs' proposed amended WADAD Class definition, there are likely other individuals

18   whose "landline never had call forwarding activated on the account," but who Plaintiffs

19   cannot ascertain due to shortcomings in the subpoenaed records.  (*See* Decert. Resp. at 23

20   (seeking to add the quoted language to the class definition).)  Plaintiffs may well be able

21   to "prove their WADAD claim for a subset of the WADAD Class consisting of the 187

22   telephone numbers identified in Mr. Hansen's expert report with common evidence in the

1   form of expert testimony." (*Id.* at 22-23.)  However, that group of 187 omits an unknown

2   quantity of would-be amended WADAD Class members whose carrier did not keep

3   records of whether call forwarding was enabled on the account.  In other words, these

4   187 would-be members may be the entire class or—more likely—the tip of the iceburg.

5        Furthermore, Plaintiffs' extensive efforts to obtain this information over the course

6   of this case demonstrate that the members of Plaintiffs' proposed amended WADAD

7   Class are not only unknown, but that they are practically unknowable.  Plaintiffs have

8   consulted experts, analyzed spreadsheets, subpoenaed carriers, and employed further

9   creative methods to satisfy the court that their class is indeed ascertainable and that

10  common questions predominate.  However, as the court cautioned, "[c]lass certification is

11  contingent on the ability to obtain the information necessary to establish class

12  membership" and "the court 'retains the flexibility to address problems with a certified

13  class as they arise, including the ability to decertify.'"  (2d CC Order at 19-20 (quoting

14  *United Steel Workers*, 593 F.3d at 807).)

15       Based on the foregoing analysis, the court concludes that the WADAD Class—as

16  currently constructed or as Plaintiffs propose amending it—faces intractable

17  individualized issues in ascertaining its members.  The court therefore denies Plaintiffs'

18  request to amend the WADAD Class definition and grants Defendants' motion to

19  decertify the WADAD Class.

20  **D.     Summary Judgment**

21       Plaintiffs have moved for summary judgment on all issues in this case.  (Plf. Mot.)

22  Defendants have cross-moved for summary judgment on Individual Defendants' liability.

ORDER- 25

1  (Dft. Mot.)  Because the court decertifies the WADAD Class herein, the court denies

2  both motions as moot insofar as they pertain to the WADAD Class.[12]  As to the TCPA

3  Class, the court first addresses Appstack's liability and then turns to Individual

4  Defendants' liability.

5      1.  TCPA Class v. Appstack

6      "The TCPA makes it unlawful, in part, 'to make any call (other than a call made

7  for emergency purposes or made with the prior express consent of the called party) using

8  any automatic telephone dialing system or an artificial or prerecorded voice . . . to any

9  telephone number assigned to a . . . cellular telephone service, . . . unless such call is

10  made solely to collect a debt owed to or guaranteed by the United States.'"  *Chen v.*

11  *Allstate Ins. Co.*, No. 13-16816, --- F.3d ---, 2016 WL 1425869, at *2 (9th Cir. Apr. 12,

12  2016) (citing 47 U.S.C. § 227(b)(1)(A)).  An aggrieved person may bring an injunctive

13  action and seek actual damages or statutory damages of $500.00 per violation.  47 U.S.C.

14  § 227(b)(3); *see also Chen*, 2016 WL 1425869, at *2.  If an offender's violation "is

15  willful or knowing, a court may treble the award."  *Chen*, 2016 WL 1425869, at *2

16  (citing 47 U.S.C. § 227(b)(3)).  The Ninth Circuit has articulated the three elements of a

17  TCPA claim as: "(1) the defendant called a cellular telephone number; (2) using an

18  automatic telephone dialing system; (3) without the recipient's prior express consent."

19  *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012).

20

21  ———————————

22      [12] Booth Law's individual WADAD and CPA claims against Defendants remain for trial.

1              *a.  Telephone Call to a Cellular Telephone Number*

2              Plaintiffs must demonstrate that Appstack placed calls to cellular telephone

3       numbers.  Plaintiffs took several steps to demonstrate that the TCPA Class received calls

4       on cell phones.  (Plf. MSJ at 10.)  Plaintiffs began with the chart that Defendants

5       produced, which indicates the time and phone number of each call that Appstack made

6       using the inContact system.  (12/19/14 Reiten Decl. Ex. 22.)  Mr. Hansen then compared

7       that chart to a cell block identifier list, which "identifies numbers that were assigned as

8       wireless numbers," and to ported number lists, which "identify numbers that have been

9       switched from landline to wireless" or vice-versa.  (Hansen Report at 4; *see also* 3/18/16

10      Murray Decl. (Dkt. # 95) ¶ 3, Ex. 6 ("Hansen Dep.") at 34:25-35:8.)  Mr. Hansen then

11      removed all calls that lasted fewer than six seconds, reasoning that there was likely no

12      contact made on those calls.  (Hansen Decl. ¶ 12.)  He concluded that Appstack made

13      601,207 calls to 90,163 different cellular phones.  (*Id.*)

14              Defendants argue that Mr. Macarenas and Mr. Gregory have presented "no

15      evidence that the telephone numbers identified with a cell phone at the time of their

16      investigation were identified with a cell phone at the time Appstack made its calls in

17      2013."  (Dft. Resp. at 19.)  However, the procedure undertaken by Mr. Hansen

18      undermines that assertion.  (*See* Hansen Report at 4; Hansen Dep. at 34:25-35:8.)  Mr.

19      Hansen controlled for telephone numbers that are currently associated with cellular

20      phones but were land lines when Defendants called them, and vice-versa.  (*See id.*)

21      Defendants identify no evidence to support their assertion that this methodology was

22      unsound (*see* Dft. Resp. at 19), and the court concludes that Plaintiffs sufficiently

ORDER- 27

1    confirmed and demonstrated that the recipient devices were indeed cellular devices (*see*

2    Hansen Report at 4; Hansen Decl. ¶ 12).[13]

3         The court concludes that the TCPA Class has demonstrated that Appstack made

4    601,207 calls to cell phones.

5         *b. Using an Automatic Telephone Dialing System*

6         The TCPA defines an "automatic telephone dialing system" as "equipment which

7    has the capacity (A) to store or produce telephone numbers to be called, using a random

8    or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

9    Predictive dialers "satisfy the TCPA's definition of autodialer." 30 F.C.C.R. 7961, 7972

10   & n.39 (internal quotations omitted). As Defendants' own expert confirms, Appstack

11   used a predictive dialer to make the subject phone calls. (Fischer Decl. ¶ 6.) Defendants

12   have also admitted that Appstack employed an "automatic dialing and announcing

13   device." (2/22/16 Murray Decl. Ex. 7 at 5.) Accordingly, the court concludes that the

14   TCPA Class is entitled to summary judgment as to this element of its claim against

15   Appstack.

16        *c. Without Prior Express Consent*

17        The court previously reserved ruling on which party bears the burden of

18   demonstrating express prior consent or a lack thereof. (1st CC Order at 20 n.6

19   _____

20       [13] In opposition to summary judgment, Defendants also reiterate their argument that
     Plaintiffs fail to demonstrate that the TCPA Class consists of those individuals that owned the

21   cellular numbers when Appstack called those numbers in 2013. (Dft. Resp. at 19.) As the court
     discussed in denying Defendants' motion to decertify the TCPA Class, *see supra* § III.C.1.a.,

22   Defendants have not demonstrated any instances of this problem, and the concern can be
     adequately addressed at the claims stage.

ORDER- 28

1   (concluding that which party had the burden was "irrelevant for class certification

2   purposes").)  The parties continue to dispute this issue.  (*See* Dft. Resp. at 20; Plf. Reply

3   at 4.)  Based on the growing collection of interpretations and caselaw available, the court

4   concludes that under the TCPA, consent is an affirmative defense.  *See* 23 F.C.C.R. 559,

5   565 (Jan. 4, 2008) ("We emphasize that prior express consent is deemed to be granted

6   only if the wireless number was provided by the consumer to the creditor, and that such

7   number was provided during the transaction that resulted in the debt owed.  To ensure

8   that creditors and debt collectors call only those consumers who have consented to

9   receive autodialed and prerecorded message calls, we conclude that the creditor should be

10  responsible for demonstrating that the consumer provided prior express consent."); *Grant*

11  *v. Capital Mgmt. Servs., L.P.*, 449 F. App'x 598, 600 n.1 (9th Cir. 2011) (citing 23

12  F.C.C.R. at 565) ("'[E]xpress consent' is not an element of a TCPA plaintiff's prima

13  facie case, but rather is an affirmative defense for which the defendant bears the burden

14  of proof."); *see also Portfolio Recovery*, 707 F.3d at 1042-43 (listing "prior express

15  consent" as an element of a TCPA claim but placing the burden on the defendant to

16  provide evidence).[14]

17  _____

18      [14] Defendants cite two cases in support of their assertion that "Plaintiffs must demonstrate
    that Appstack did not have consent for the telephone calls." (Dft. Resp. at 20 (citing *Meyer v.*
19  *Bebe Stores, Inc.*, No. 14-cv-00267-YGR, 2015 WL 431148, at *3 (N.D. Cal. Feb. 2, 2015) and
    *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2013 WL 1154206, at *3 (N.D. Ill.
20  Mar. 19, 2013)).)  *Bebe Stores*, which Defendants designated as their best authority at oral
    argument, expressly acknowledges that the Ninth Circuit treats consent as an affirmative defense,
21  and the case therefore does not support Defendants' position. 2015 WL 431148 at *3 n.3 (citing
    *Grant*, 449 F. App'x at 600 n.1).  *Bridgeview*, on the other hand, states that "the plaintiff must
22  show" that the defendant lacked "the recipient's prior express permission or invitation."  2013
    WL 1154206, at *3 (citing 47 U.S.C. 227(a)-(b)).  However, consent was undisputed in

1    Defendants posit two scenarios in which Appstack obtained consent from a

2    member of the TCPA Class—if the class member was a previous Appstack customer and

3    had provided contact information as part of a prior purchase, or if the class member

4    provided his phone number in response to one of Appstack's various marketing efforts.

5    (Dft. Resp. at 20-22.)  Mr. Espinosa attests that "enter[ing the prospective customer's]

6    telephone number" was the "first step in any marketing campaign." (3/14/16 Espinosa

7    Decl. (Dkt. # 88) ¶ 3); *see also Van Patten*, 22 F. Supp. 3d at 1078 (concluding that

8    providing a phone number when signing up as a customer constitutes consent under the

9    TCPA).  Mr. Kirkpatrick elaborates that telemarketing was not Appstack's sole source of

10   customers, and that SalesGenie was only one of "various sources" of telephone numbers

11   input into the autodialer.  (Kirkpatrick Decl. ¶¶ 5-6.)

12    Plaintiffs respond that Appstack acquired a substantial amount of the phone

13   numbers through SalesGenie, which does not check whether members of that list consent

14   to "accept auto-dialed or robocalls." (2/22/16 Murray Decl. ¶ 17, Ex. 16 ("Fruehwald

15   Dep.") at 8:12-9:1; Plf. MSJ at 10.)  As to prior customers and other consenting sources

16   ───────────────────────

17   *Bridgeview*. *Id.* ("Defendants contend that genuine issues of fact remain in four main areas: (1) whether the facsimiles were received, (2) the contents of the facsimile in question, (3) the vicarious liability of Defendant for facsimiles sent by B2B on Defendant's behalf, and (4)

18   whether Defendant 'willfully or knowingly' violated the TCPA . . . .").  Furthermore, that case comes from a district court outside the Ninth Circuit and conflicts with the Ninth Circuit's

19   interpretation of the TCPA. *See Portfolio Recovery*, 707 F.3d at 1042; *Grant*, 449 F. App'x at 600 n.1; *see also Heinrichs v. Wells Fargo Bank, N.A.*, No. C 13-05434 WHA, 2014 WL

20   985558, at *2 (N.D. Cal. Mar. 7, 2014) (collecting cases); *Gossett v. CMRE Fin. Servs.*, No. 15cv803 MMA (NLS), 2015 WL 6736883, at *3-4 (S.D. Cal. Oct. 30, 2015) (treating prior

21   express consent under the TCPA as an affirmative defense that the defendant must prove); *Van Patten v. Vertical Fitness Grp., LLC*, 22 F. Supp. 3d 1069, 1073 (S.D. Cal. May 20, 2014)

22   (same).  The court respectfully declines to follow *Bridgeview*'s passing statement of the law and concludes that Defendants bear the burden of demonstrating consent under the TCPA.

1   of phone numbers, there is no guarantee that those individuals would provide a cell

2   number rather than any other telephone number, and thus it is uncertain any of these

3   customers would be members of the TCPA Class.  Furthermore, Plaintiffs requested

4   discovery of "consent to receiving calls from Appstack" and received no relevant

5   production from Defendants.  (2/22/16 Murray Decl. ¶ 7, Ex. 6; *see also* 5/10/16 Murray

6   Decl. ¶ 11.)  Indeed, the record reveals only one specific cell phone number that was

7   dialed with the subscriber's consent; it belonged to one of Appstack's employees, and she

8   provided her cell phone number to help test the system.  (2/22/16 Murray Decl. ¶ 19, Ex.

9   18 at 1.)

10      Viewing the evidence is the light most favorable to Defendants, the court

11  concludes that there is sufficient circumstantial evidence before the court to reasonably

12  conclude that some members of the TCPA Class consented.  Plaintiffs are correct that

13  Defendants' evidence does not clearly indicate consent for any given phone call.

14  However, Appstack's "win-back campaign" and other marketing efforts make it likely

15  that some portion of the TCPA Class consented.  (*See* 11/14/14 Reiten Decl. Exs. 7, 15 at

16  10.)  Although the consenting portion of the TCPA Class appears to be small, the record

17  demonstrates that the issue is unsuited for summary judgment on a classwide basis.

18      In summary, the court concludes that the TCPA Class is entitled to summary

19  judgment on its prima facie claim against Appstack, but Appstack's affirmative defense

20  of consent remains for trial.  Because the TCPA Class has not established liability, the

21  court denies Plaintiffs' motion for summary judgment on willfulness and damages, both

22  of which also remain for trial.

ORDER- 31

1        2.  TCPA Class v. Individual Defendants

2        Each side argues that it is entitled to summary judgment as to Individual

3  Defendants' liability to the TCPA Class.  (Dft. MPSJ; Plf. MSJ at 10-12, 16-17.)  In the

4  Ninth Circuit, "[a] corporate officer or director is, in general, personally liable for all torts

5  which he authorizes or directs or in which he participates, notwithstanding that he acted

6  as an agent of the corporation and not on his own behalf."  *Transgo, Inc. v. Ajac*

7  *Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985) (internal quotations

8  omitted); *see also United States v. Reis*, 366 F. App'x 781, 782 (9th Cir. 2010) (citing

9  Restatement (Third) of Agency § 7.01 (2006)); *Coastal Abstract Serv., Inc. v. First Am.*

10  *Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (holding that a corporate officer or

11  director "cannot hide behind the corporation where he is an actual participant in the tort"

12  (internal quotations omitted)).  Although the Ninth Circuit has not applied this doctrine in

13  the TCPA context, district courts have held that "corporate actors may be held

14  individually liable for violating the TCPA where they had direct, personal participation in

15  or personally authorized the conduct found to have violated the statute."[15]  *Ott v. Mortg.*

16

---

17     [15] Defendants rely heavily on *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892

18  (W.D. Tex. 2001), and *Mais v. Gulf Coast Collection Bureau, Inc.*, No. 11-61939-Civ., 2013 WL 1283885 (S.D. Fla. 2013), in support of their position on Individual Defendants' liability.  (*See*

19  Dft. MPSJ at 14-16.)  *American Blastfax* relies on the Fifth Circuit's rule regarding statutory liability for corporate officers, which is considerably narrower than the Ninth Circuit's rule on

20  that issue.  *Compare American Blastfax*, 164 F. Supp. 2d at 898 (quoting *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985)) (finding that corporate officers must be the

21  "'guiding spirits' and the 'central figures' behind the TCPA violations" to be found liable) *with Transgo*, 768 F.2d at 1021.  *Mais* also applies out-of-circuit law and concludes that "[s]ome showing of intentional misconduct or gross failure to implement policies that comply should be

22  required."  2013 WL 1283885, at *4 n.1.  Both *American Blastfax* and *Mais* conflict with binding precedent from the Ninth Circuit, and thus the court finds them unpersuasive.

1  *Inv'rs Corp. of Ohio, Inc.*, 65 F. Supp. 3d 1046, 1060 (D. Or. 2014) (internal quotations

2  omitted) (collecting cases).

3      Both parties have submitted evidence relevant to whether Individual Defendants

4  participated in or knowingly approved of Appstack's robocalls.[16]  Plaintiffs have

5  demonstrated that Mr. Zdanowski paid for the lead list from SalesGenie, although

6  Appstack's typical practice allowed various employees to use cards linked to Mr.

7  Zdanowski's account without his specific approval.  (Zdanowski Dep. at 48:19-21,

8  49:17-50:15; Zdanowski Decl. ¶ 16; Moore Dep. 46:5-13.)  Plaintiffs have also identified

9  numerous warnings related to the autodialer that Individual Defendants ignored.  (Ricci

10  Dep. at 39:23-42:5; Zdanowski Dep. at 71:17-4; 2/22/16 Murray Decl. ¶¶ 18-19, Exs.

11  17-18.)  Instead, Individual Defendants retained the autodialing campaign because it was

12  "making sales."  (Ricci Dep. at 41:12-15.)  This evidence suggests that Individual

13  Defendants "personally authorized the conduct found to have violated the statute."  *Ott*,

14  65 F. Supp. 3d at 1060.

15      However, Individual Defendants have submitted evidence that shows some degree

16  of removal from the call center.  The structure of the company makes it unclear how

17  involved Individual Defendants were with Appstack's day-to-day operations.

18  ————————————

19      [16] The court rejects Plaintiffs' characterization of Defendants' response to Plaintiffs' first
request for admission.  (Plf. MSJ at 11 (quoting 2/22/16 Murray Decl. Ex. 7 at 5) ("In response

20  to requests for admission, Zdanowski and Espinosa admit to (1) 'using an automatic dialing and
announcing device to promote Appstack's products' and (2) 'taking steps necessary to physically

21  place the calls.'").)  Defendants admitted to "the use of an automatic dialing and announcing
device to promote [Appstack's] products and/or services."  (2/22/16 Murray Decl. Ex. 7 at 5.)

22  The court takes this passive language as an admission that the described behavior occurred at
Appstack, not that each Defendant participated in the behavior.

1   (Zdanowski Decl. ¶¶ 10, 13-16, 26; 1/29/16 Espinosa Decl. ¶¶ 9-17, 23; Johnson Decl.

2   ¶¶ 13-14.)  For instance, Individual Defendants attest that they fully delegated operations

3   of the sales team, including the institution and operation of a do-not-call list.  (*See*

4   1/29/16 Espinosa Decl. ¶¶ 25-26, 29; Espinosa Dep. at 56:18-58:21; Zdanowski Dep. at

5   48:4-50:21.)  Mr. Kirkpatrick corroborates Individual Defendants' account.  (*See*

6   Kirkpatrick Decl. ¶¶ 4, 12 ("As part of my job as Director of Sales (and in managing the

7   sales team), I instructed the sales team to maintain and update the [do-not-call list]."), 13

8   ("If we received a complaint about a call, I would always review the [do-not-call] policy

9   with the sales team at the next day's meeting.  Neither Steve Espinoza [sic] nor John

10  Zdanowski was involved in the daily sales meetings."), 16 ("[N]either Steve Espinoza

11  [sic] nor John Zdanowski were involved in the set-up of the call center, the operations of

12  the call center, scrubbing the data against the [do-not-call list], updating the [do-not-call

13  list], making the calls, or the day-to-day operations of the sales team.  They were not

14  personally involved in the call center or its operations.").)  It is not clear to what extent

15  the do-not-call list functioned.  *See supra* n.3.  Moreover, it is not clear that a functioning

16  do-not-call list would have mitigated the majority of the TCPA violations alleged in this

17  case.  However, the degree of delegation renders uncertain the extent to which Individual

18  Defendants were "personally" involved.

19          Taken holistically, the evidence defeats both Individual Defendants' and

20  Plaintiffs' motions for summary judgment.  Reasonable minds could differ as to whether

21  Individual Defendants "direct[ly], personal[ly] participat[ed] in or personally authorized"

22

ORDER- 34

1    the allegedly offending conduct.  *Ott*, 65 F. Supp. 3d at 1060.  The court accordingly

2    denies summary judgment on Individual Defendants' liability to the TCPA Class.[17]

3    **E.      Motions to Strike**

4          Both sides have moved to strike or limit the purpose of certain evidence submitted

5    in conjunction with the opposing parties' motion for summary judgment.  (Plf. Resp. at

6    9-16; Dft. Resp. at 12-13; Plf. Surreply (Dkt. # 84).)

7          Several pieces of evidence submitted in support of Defendants' motion for

8    summary judgment are improper or can only be considered for a limited purpose.  (*See,*

9    *e.g.*, Zdanowski Decl. ¶ 26 (stating, with an apparent lack of personal knowledge, that "I

10   presume Appstack's point of contact would have been Scott, Todd, and/or Pete").)  The

11   court can only consider admissible evidence in ruling on a motion for summary

12   judgment.  *Orr*, 285 F.3d at 773.  Accordingly, the court grants in part Plaintiffs' motion

13   and has declined to consider the inadmissible evidence herein.  The court denies the

14   remainder of Plaintiffs' motion, which concerns evidence that did not impact the court's

15   analysis, as moot.

16         Plaintiffs also move to strike the March 16, 2016, Gruber Declaration (Dkt. # 93)

17   as untimely and the Fischer Declaration (Dkt. # 92) as beyond the scope of Mr. Fischer's

18   expert report.  (Plf. Reply at 2-3.)  At oral argument, Defendants conceded that the

19   _____

20         [17] The court also rejects Defendants' argument that "summary judgment is also
     procedurally appropriate because Plaintiffs' SAC fails the pleading requirements of FRCP Rule
21   8."  (Dft. MPSJ at 20.)  The operative complaint is more than sufficient to satisfy Federal Rule of
     Civil Procedure 8 as to Individual Defendants.  (*See, e.g.*, SAC ¶¶ 3.5-3.6 (alleging that
22   Individual Defendants "directly and personally participated in, directed and/or authorized the
     statutory violations alleged herein").)

1 │ Gruber Declaration was untimely submitted.  However, because none of the court's

2 │ analysis or conclusions herein depend on evidence presented in either of those

3 │ declarations, the court denies Plaintiffs' motion as moot.

4 │      Defendants move to strike the information that Plaintiffs' counsel obtained from

5 │ Search Bug as lacking foundation.  (*See* 4/29/15 Reiten Decl.; Hoover Decl. (Dkt. # 60).)

6 │ As Plaintiffs acknowledged at oral argument, none of the Search Bug information was

7 │ admissible in support of or opposition to summary judgment.  *See Canada v. Blain's*

8 │ *Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) ("[D]ocuments which have not had a

9 │ proper foundation laid to authenticate them cannot support a motion for summary

10 │ judgment . . . [or] defeat a motion for summary judgment.").  The court did not consider

11 │ that evidence because this order does not reach the merits of the WADAD Class's claims.

12 │ *See supra* § III.C.2.; (*see also* 5/10/16 Murray Decl. ¶ 10 ("None of the subpoenaed

13 │ records relate to any of the TCPA Class members.").)  The court therefore denies

14 │ Defendants' motion to strike the Search Bug evidence as moot.

15 │      Finally, Defendants move to strike Mr. Hansen's second supplemental declaration

16 │ (Dkt. # 107) and the supplemental declaration of Cameron Azari (Dkt. # 108), both of

17 │ which Plaintiffs submitted with their response to Defendants' motion to decertify the

18 │ classes.  (*See* Decert. Reply at 11-12.)  Defendants assert that Mr. Hansen's second

19 │ supplemental declaration "goes far beyond his initial expert disclosures" (*id.* at 11), but

20 │ Defendants have made no showing that this representation is true or that any of this

21 │ evidence is otherwise inadmissible.  Moreover, Mr. Hansen's second supplemental

22 │ declaration informed the court's decision only to the extent it was consistent with his

1  report and prior declaration.  Because the court's determinations herein did not turn on

2  the purportedly improper evidence in either Mr. Hansen or Mr. Azari's declarations, the

3  court denies Defendants' motion as moot.

4  **F.    Motion to Seal**

5        The parties submitted a stipulated motion to seal certain subpoena responses that

6  contain confidential information pursuant to the parties' protective order.  (Stip. MTS.)

7  The parties have demonstrated good cause to seal the documents.  (*See id.* at 2-4.)

8  Accordingly, the court grants the motion to seal and directs the Clerk to maintain the seal

9  on the relevant documents (Dkt. ## 90-24, 90-26, 90-31, 90-33, 90-45).

10                     **IV.    CONCLUSION**

11        The court GRANTS in part and DENIES in part Defendants' motion to decertify

12  both classes (Dkt. # 101), DENIES Defendants' motion for partial summary judgment

13  (Dkt. # 69), GRANTS in part and DENIES in part Plaintiffs' motion for summary

14  judgment (Dkt. # 77), GRANTS the parties' stipulated motion to seal (Dkt. # 97), and

15  GRANTS in part and DENIES in part the various motions to strike.

16        More specifically, the court DECERTIFIES the WADAD Class, leaving Booth

17  Law's individual claims against Defendants for trial.  The court GRANTS the TCPA

18  Class summary judgment against Appstack on its prima facie case, but Appstack's

19  affirmative defense of consent and the issues of willfulness and damages remain for trial.

20  The court DENIES summary judgment on Individual Defendants' liability to the TCPA

21  Class.

22

1     The court will separately issue a minute order scheduling a hearing at which the

2     court will take up future case deadlines, including the trial date.  However, the court will

3     not reopen any deadlines from the court's scheduling order (Dkt. # 66) that had passed

4     before the court's April 27, 2016, order (Dkt. # 103).

5         Dated this 24th day of May, 2016.

6

7

8                                    JAMES L. ROBART
                                     United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 38